DEPARTMENT OF REVENUE OF MONTANA *v.*
KURTH RANCH ET AL.

No. 93–144.   Argued January 19, 1994—Decided June 6, 1994

STEVENS, J., delivered the opinion of the Court, in which BLACKMUN, KENNEDY, SOUTER, and GINSBURG, JJ., joined. REHNQUIST, C. J., *post,* p. 785, and O'CONNOR, J., *post,* p. 792, filed dissenting opinions. SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined, *post,* p. 798.

*Paul Van Tricht,* Special Assistant Attorney General of Montana, argued the cause for petitioner. With him on the briefs was *David W. Woodgerd,* Special Assistant Attorney General.

*James A. Feldman* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Days* and *Deputy Solicitor General Bender.*

*James H. Goetz* argued the cause and filed a brief for respondents.*

JUSTICE STEVENS delivered the opinion of the Court.

This case presents the question whether a tax on the possession of illegal drugs assessed after the State has imposed a criminal penalty for the same conduct may violate the constitutional prohibition against successive punishments for the same offense.[1]

---

*Dan Morales, Attorney General of Texas, and *William E. Storie*, Assistant Attorney General, filed a brief for the State of Texas et al. as *amici curiae* urging reversal, joined by the Attorneys General for their respective States as follows: *Grant Woods* of Arizona, *Daniel E. Lungren* of California, *Gale Norton* of Colorado, *Richard Blumenthal* of Connecticut, *Robert A. Butterworth* of Florida, *Michael J. Bowers* of Georgia, *Robert A. Marks* of Hawaii, *Larry EchoHawk* of Idaho, *Roland W. Burris* of Illinois, *Pamela Fanning Carter* of Indiana, *Bonnie J. Campbell* of Iowa, *Robert T. Stephan* of Kansas, *Richard P. Ieyoub* of Louisiana, *Michael E. Carpenter* of Maine, *Hubert H. Humphrey III* of Minnesota, *Don Stenberg* of Nebraska, *Frederick P. DeVesa* of New Jersey, *Tom Udall* of New Mexico, *Michael F. Easley* of North Carolina, *Jeffrey B. Pine* of Rhode Island, *T. Travis Medlock* of South Carolina, *Mark Barnett* of South Dakota, *Jan Graham* of Utah, and *James E. Doyle* of Wisconsin.

[1] The Fifth Amendment provides that "No person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb . . . ." The Double Jeopardy Clause protects against a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple punishments for the same offense. See *North Carolina* v. *Pearce*, 395 U. S. 711, 717 (1969). Although its text mentions only harms to "life or limb," it is well settled that the Amendment covers imprisonment and monetary penalties. See, *e. g., Ex parte Lange*, 18 Wall. 163 (1874); *United States* v. *Halper*, 490 U. S. 435 (1989). In *Benton* v. *Maryland*, 395 U. S. 784, 794 (1969), we held that this guarantee "represents a fundamental ideal in our constitutional heritage, and that it should apply to the States through the Fourteenth Amendment." See W. LaFave & J. Israel, Criminal Procedure 1058–1059 (2d ed. 1992); 2 D. Rudstein, C. Erlinder, & D. Thomas, Criminal Constitutional Law ¶ 11.01[3][b], pp. 11–59 to 11–60 (1993).

## I

Montana's Dangerous Drug Tax Act[2] took effect on October 1, 1987. The Act imposes a tax "on the possession and storage of dangerous drugs,"[3] Mont. Code Ann. § 15–25–111 (1987), and expressly provides that the tax is to be "collected only after any state or federal fines or forfeitures have been satisfied." § 15–25–111(3). The tax is either 10 percent of the assessed market value of the drugs as determined by the Montana Department of Revenue (DOR) or a specified amount depending on the drug ($100 per ounce for marijuana, for example, and $250 per ounce for hashish), whichever is greater. § 15–25–111(2). The Act directs the state treasurer to allocate the tax proceeds to special funds to support "youth evaluation" and "chemical abuse" programs and "to enforce the drug laws." §§ 15–25–121, 15–25–122.[4]

In addition to imposing reporting responsibilities on law enforcement agencies,[5] the Act also authorizes the DOR to

---

[2] Mont. Code Ann. §§ 15–25–101 through 15–25–123 (1987). See *In re Kurth Ranch*, 145 B. R. 61, 66 (Bkrtcy. Ct. Mont. 1990). We refer throughout this opinion to the 1987 edition of the Montana Code—the version in effect at the time of the Kurths' arrest. Some sections of the Dangerous Drug Tax Act have since been amended.

[3] The Act defines "dangerous drug" as that term is defined in the Montana Code provisions that criminalize the possession of such drugs, see Mont. Code Ann. §§ 15–25–103(2), 50–32–101(6), 45–9–102 (1987), and authorize their seizure, see § 44–12–103.

[4] According to the Act's preamble, the Montana Legislature recognizes that the use of dangerous drugs is not acceptable, but concludes that because the manufacturing and sale of such drugs has an economic impact on the State, "it is appropriate that some of the revenue generated by this tax be devoted to continuing investigative efforts directed toward the identification, arrest, and prosecution of individuals involved in conducting illegal continuing criminal enterprises that affect the distribution of dangerous drugs in Montana." 1987 Mont. Laws, ch. 563, p. 1416.

[5] Section 5(1) of the Act provides that "[a]ll law enforcement personnel and peace officers shall promptly report each person subject to the tax to the department, together with such other information which the depart-

adopt rules to administer and enforce the tax. Under those rules, taxpayers must file a return within 72 hours of their arrest. Mont. Admin. Rule 42.34.102(1) (1988). The Rule also provides that "[a]t the time of arrest law enforcement personnel shall complete the dangerous drug information report as required by the department and afford the taxpayer an opportunity to sign it." Rule 42.34.102(3). If the taxpayer refuses to do so, the law enforcement officer is required to file the form within 72 hours of the arrest. *Ibid.* The "associated criminal nature of assessments under this act" justifies the expedited collection procedures. See Rule 42.34.103(3). The taxpayer has no obligation to file a return or to pay any tax unless and until he is arrested.

## II

The six respondents, all members of the extended Kurth family, have for years operated a mixed grain and livestock farm in central Montana.[6] In 1986 they began to cultivate and sell marijuana. About two weeks after the new Dangerous Drug Tax Act went into effect, Montana law enforcement officers raided the farm, arrested the Kurths, and confiscated all the marijuana plants, materials, and paraphernalia they found. *In re Kurth Ranch*, 145 B. R. 61, 66 (Bkrtcy. Ct. Mont. 1990).[7] The raid put an end to the

---

ment may require, in a manner and on a form prescribed by the department." Mont. Code Ann. § 15–25–113(1) (1987).

[6] The respondents are Richard Kurth; his wife, Judith Kurth; their son, Douglas Kurth; their daughter, Cindy Halley; Douglas' wife, Rhonda Kurth; and Cindy's husband, Clayton Halley.

[7] The Drug Tax Report listed the following seized items:

"Item #1: 2155 marijuana plants in various stages of growth,

"Item #2: 7 gallons of hash oil, (lined out),

"Item #3: 4 bags of marijuana at two pounds each,

"Item #4: 65/one gram vials of hash tar,

"Item #5: 14 baby food size jars of hash tar,

"Item #6: 7 pint jars of hash tar,

marijuana business and gave rise to four separate legal proceedings.

In one of those proceedings, the State filed criminal charges against all six respondents in the Montana District Court, charging each with conspiracy to possess drugs with the intent to sell, Mont. Code Ann. § 45–4–102 (1987), or, in the alternative, possession of drugs with the intent to sell, § 45–9–103.[8] Each respondent initially pleaded not guilty, but subsequently entered into a plea agreement. On July 18, 1988, the court sentenced Richard Kurth and Judith Kurth to prison and imposed suspended or deferred sentences on the other four family members.[9]

The county attorney also filed a civil forfeiture action seeking recovery of cash and equipment used in the marijuana operation. The confiscated drugs were not involved in that action, presumably because law enforcement agents had destroyed them after an inventory. Respondents settled the forfeiture action with an agreement to forfeit $18,016.83 in cash and various items of equipment.

---

"Item #7: 1 bag of marijuana, 1/4 pound,

"Item #8: 5 plastic bags of marijuana, total 2230 grams,

"Item #9: approximately 100 pounds of marijuana stems, leaves, parts, etc." 145 B. R., at 66–67.

[8] Plaintiff's Exhs. 3, 5, 7, 9, 11, 13; 145 B. R., at 64–65. Richard Kurth was also charged with criminal sale of dangerous drugs (marijuana), Mont. Code Ann. § 45–9–101 (1987), criminal possession of a dangerous drug (marijuana) with intent to sell, § 45–9–103, solicitation to commit the offense of criminal possession of a dangerous drug (marijuana) with intent to sell, § 45–4–101, and criminal possession of a dangerous drug (hashish), § 45–9–102. See Plaintiff's Exh. 3.

[9] Because only one respondent, Richard Kurth, was adjudged guilty of the offense of possession (the other five pleaded guilty to the conspiracy count), Montana has suggested that only he has standing to argue that the tax on possession constitutes a second punishment for the same offense. Respondents counter that Montana's withdrawal of the possession charges pursuant to the plea agreements would bar a second prosecution for possession. The issue was not raised below, so we do not address it.

The third proceeding involved the assessment of the new tax on dangerous drugs. Despite difficulties the DOR had in applying the Act for the first time, it ultimately attempted to collect almost $900,000 in taxes on marijuana plants, harvested marijuana, hash tar and hash oil, interest, and penalties.[10] The Kurths contested the assessments in administrative proceedings. Those proceedings were automatically stayed in September 1988, however, when the Kurths initiated the fourth legal proceeding triggered by the raid on their farm: a petition for bankruptcy under Chapter 11 of the Bankruptcy Code. See 11 U. S. C. § 362(a).

In the bankruptcy proceedings, the Kurths objected to the DOR's proof of claim for unpaid drug taxes and challenged the constitutionality of the Montana tax. After a trial, the Bankruptcy Court held most of the assessment invalid as a matter of state law,[11] but concluded that an assessment of $181,000 on 1,811 ounces of harvested marijuana was authorized by the Act. It held that assessment invalid under the Federal Constitution.

Relying primarily on *United States* v. *Halper,* 490 U. S. 435 (1989), the Bankruptcy Court decided that the assessment constituted a form of double jeopardy. The court rejected the State's argument that the tax was not a penalty because it was designed to recover law enforcement costs; as the court noted, the DOR "failed to introduce one scintilla of evidence as to cost of the above government programs or costs of law enforcement incurred to combat illegal drug

---

[10] The precise figure appears to be $894,940.99. 145 B. R., at 68. The Court of Appeals' figure of "nearly $865,000," *In re Kurth Ranch,* 986 F. 2d 1308, 1310 (CA9 1993), apparently failed to take account of the $30,000 collected before computation of the final assessment. 145 B. R., at 68.

[11] Specifically, the Bankruptcy Court held that the assessments on the live marijuana plants and the marijuana oil were "arbitrary" and "lacked any basis in fact." *Id.,* at 69.

activity." 145 B. R., at 74. After noting that a portion of the assessment resulted in a tax eight times the product's market value,[12] the court explained that the punitive character of the tax was evident

> "because drug tax laws have historically been regarded as penal in nature, the Montana Act promotes the traditional aims of punishment—retribution and deterrence, the tax applies to behavior which is already a crime, the tax allows for sanctions by restraint of Debtors' property, the tax requires a finding of illegal possession of dangerous drugs and therefore a finding of *scienter*, the tax will promote elimination of illegal drug possession, and the tax appears excessive in relation to the alternate purpose assigned, especially in the absence of any record developed by the State as to societal costs. Finally, the tax follows arrest for possession of illegal drugs and the tax report is made by law enforcement officers, not the taxpayer, who may or may not sign the report." *Id.*, at 75–76.

These aspects led the court to the "inescapable conclusion" that the drug tax statute's purpose was deterrence and punishment. *Id.*, at 76.

The District Court affirmed. Agreeing with the Bankruptcy Court's findings and reasoning, it concluded that the Montana Dangerous Drug Tax Act "simply punishes the Kurths a second time for the same criminal conduct." *In re Kurth Ranch*, CV–90–084–GF, 1991 WL 365065 (D. Mont., Apr. 23, 1991) (reprinted at App. to Pet. for Cert. 22). That

---

[12] That portion is the tax imposed upon 100 pounds of "shake." "Shake" refers to the stems, leaves, and other loose parts of the marijuana plant that have less value because of their lower levels of tetrahydrocannabinol (THC), the chemical substance in marijuana that activates a user's senses. *Id.*, at 66. Officials placed the market value for shake at $200 per pound. Thus, when Montana taxed the shake at $100 per ounce, or $1,600 per pound, it taxed it at eight times its market value. *Id.*, at 72.

and the DOR's failure to provide an accounting of its actual damages or costs convinced the Bankruptcy Court that the tax assessments violated the Fifth Amendment's Double Jeopardy Clause. *Ibid.*

The Court of Appeals for the Ninth Circuit also affirmed, but based its conclusion largely on the State's refusal to offer evidence justifying the tax, and accordingly refused to hold the tax unconstitutional on its face. *In re Kurth Ranch,* 986 F. 2d 1308, 1312 (1993). The court first determined that under *Halper,* a disproportionately large civil penalty can be punitive for double jeopardy purposes. 986 F. 2d, at 1310. That the assessment is called a tax, as opposed to some kind of penalty, is not controlling. *Id.,* at 1310–1311. The central inquiry under *Halper,* the court determined, is whether the sanction imposed is rationally related to the damages the government suffered. 986 F. 2d, at 1311. That inquiry only applies to cases in which there has been a separate criminal conviction, however.[13] The court concluded that the Kurths were entitled to an accounting to determine if the sanction constitutes an impermissible second punishment, and because the State refused to offer any such evidence, it held the tax unconstitutional as applied to the Kurths. *Id.,* at 1312.

While this case was pending on appeal, the Montana Supreme Court reversed two lower state-court decisions that had held that the Dangerous Drug Tax Act was a form of double jeopardy. *Sorensen* v. *State Dept. of Revenue,* 254 Mont. 61, 836 P. 2d 29 (1992). Over the dissent of two jus-

---

[13] It is on this basis that the court distinguished this Court's cases holding a federal marijuana tax to be nonpunitive, see *Minor* v. *United States,* 396 U. S. 87 (1969); *United States* v. *Sanchez,* 340 U. S. 42 (1950), which did not involve previous criminal convictions. 986 F. 2d, at 1311. The court acknowledged that a State may legitimately tax criminal activities, *ibid.,* (citing *Marchetti* v. *United States,* 390 U. S. 39, 44 (1968)), and that a civil sanction need not satisfy a remedial analysis when it is imposed apart from a criminal conviction. 986 F. 2d, at 1311 (citing *Commonwealth Edison Co.* v. *Montana,* 453 U. S. 609, 623 (1981)).

tices, the State Supreme Court found that the legislature had intended to establish a civil, not a criminal, penalty and that the tax had a remedial purpose other than promoting retribution and deterrence. *Id.*, at 65, 836 P. 2d, at 31. The court found that *Halper* was not controlling, both because it expressly announced "'a rule for the rare case'" and because the case involved a civil penalty, not a tax. 254 Mont., at 67, 836 P. 2d, at 32–33. The *Sorensen* court concluded that the drug tax was not excessive and that a tax, unlike the civil sanction at issue in *Halper*, requires no proof of the State's remedial costs on the part of the State. 254 Mont., at 67–68, 836 P. 2d, at 33.

The Montana Supreme Court's decision is directly at odds with the conclusion reached in the federal proceedings involving the Kurths. We therefore granted certiorari to review the decision of the Court of Appeals. 509 U. S. 953 (1993). We now affirm its judgment.

### III

In *Halper* we considered "whether and under what circumstances a civil penalty may constitute 'punishment' for the purposes of double jeopardy analysis." 490 U. S., at 436. Our answer to that question does not decide the different question whether Montana's tax should be characterized as punishment.

Halper was convicted of 65 separate violations of the criminal false claims statute, 18 U. S. C. § 287, each involving a demand for $12 in reimbursement for medical services worth only $3. After Halper was sentenced to two years in prison and fined $5,000, the Government filed a separate action to recover a $2,000 civil penalty for each of the 65 violations. See 31 U. S. C. § 3729 (1982 ed., Supp. II). The District Court found that the $130,000 recovery the statute authorized "bore no 'rational relation' to the sum of the Government's $585 actual loss plus its costs in investigating and prosecuting Halper's false claims." 490 U. S., at 439. In

the court's view, a civil penalty "more than 220 times greater than the Government's measurable los[s] qualified as punishment" that was barred by the Double Jeopardy Clause. *Ibid.*

On direct appeal to this Court, we rejected the Government's submission that the Double Jeopardy Clause only applied to punishment imposed in criminal proceedings, reasoning that its violation "can be identified only by assessing the character of the actual sanctions imposed on the individual by the machinery of the state." *Id.*, at 447.[14] In making such an assessment, "the labels 'criminal' and 'civil' are not of paramount importance." *Ibid.* Accepting the District Court's findings, we held that "a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution." *Id.*, at 448–449.

*Halper* thus decided that the legislature's description of a statute as civil does not foreclose the possibility that it has a punitive character.[15] We also recognized in *Halper* that a so-called civil "penalty" may be remedial in character if it merely reimburses the government for its actual costs arising from the defendant's criminal conduct. *Id.*, at 449–450,

---

[14] We noted, however, that whether a sanction constitutes punishment is not determined from the defendant's perspective, as even remedial sanctions carry the "sting of punishment." 490 U. S., at 447, n. 7 (citing *United States ex rel. Marcus* v. *Hess*, 317 U. S. 537, 551 (1943)).

[15] Notably, in reaching that conclusion we relied in part on an earlier case recognizing that a tax statute might be considered punitive in character for double jeopardy purposes. See 490 U. S., at 443. That case, *United States* v. *La Franca*, 282 U. S. 568 (1931), observed that the words "tax" and "penalty" "are not interchangeable, one for the other" and that "if an exaction be clearly a penalty it cannot be converted into a tax by the simple expedient of calling it such." *Id.*, at 572. See also *Lipke* v. *Lederer*, 259 U. S. 557, 561 (1922) ("The mere use of the word 'tax' in an act primarily designed to define and suppress crime is not enough to show that within the true intendment of the term a tax was laid").

452. We therefore remanded the case to the District Court to determine what portion of the statutory penalty could be sustained as compensation for the Government's actual damages.

*Halper* did not, however, consider whether a tax may similarly be characterized as punitive.

## IV

Criminal fines, civil penalties, civil forfeitures, and taxes all share certain features: They generate government revenues, impose fiscal burdens on individuals, and deter certain behavior. All of these sanctions are subject to constitutional constraints. A government may not impose criminal fines without first establishing guilt by proof beyond a reasonable doubt. Cf. *In re Winship*, 397 U. S. 358 (1970). A defendant convicted and punished for an offense may not have a nonremedial civil penalty imposed against him for the same offense in a separate proceeding. *United States* v. *Halper*, 490 U. S. 435 (1989). A civil forfeiture may violate the Eighth Amendment's proscription against excessive fines. *Austin* v. *United States*, 509 U. S. 602 (1993). And a statute imposing a tax on unlawful conduct may be invalid because its reporting requirements compel taxpayers to incriminate themselves. *Marchetti* v. *United States*, 390 U. S. 39 (1968).

As a general matter, the unlawfulness of an activity does not prevent its taxation. *Id.*, at 44; *United States* v. *Constantine*, 296 U. S. 287, 293 (1935); *James* v. *United States*, 366 U. S. 213 (1961). Montana no doubt could collect its tax on the possession of marijuana, for example, if it had not previously punished the taxpayer for the same offense, or, indeed, if it had assessed the tax in the same proceeding that resulted in his conviction. *Missouri* v. *Hunter*, 459 U. S. 359, 368–369 (1983); see also *Halper*, 490 U. S., at 450. Here, we ask only whether the tax has punitive characteris-

tics that subject it to the constraints of the Double Jeopardy Clause.

Although we have never held that a tax violated the Double Jeopardy Clause, we have assumed that one might.[16] In the context of other constitutional requirements, we have repeatedly examined taxes for constitutional validity. We have cautioned against invalidating a tax simply because its enforcement might be oppressive or because the legislature's motive was somehow suspect. *A. Magnano Co.* v. *Hamilton*, 292 U. S. 40, 44 (1934). Yet we have also recognized that "there comes a time in the extension of the penalizing features of the so-called tax when it loses its character as such and becomes a mere penalty with the characteristics of regulation and punishment." *Id.*, at 46 (citing *Child Labor Tax Case*, 259 U. S. 20, 38 (1922)). That comment, together with *Halper*'s unequivocal statement that labels do not control in a double jeopardy inquiry, indicates that a tax is not immune from double jeopardy scrutiny simply because it is a tax.

*Halper* recognized that "[t]his constitutional protection is intrinsically personal," and that only "the character of the actual sanctions" can substantiate a possible double jeopardy violation. 490 U. S., at 447. Whereas fines, penalties, and forfeitures are readily characterized as sanctions, taxes are typically different because they are usually motivated by

---

[16] In *Helvering* v. *Mitchell*, 303 U. S. 391 (1938), for example, this Court considered a Revenue Act provision requiring the taxpayer to pay an additional 50 percent of the total amount of any deficiency due to fraud with an intent to evade the tax. The Court assumed such a penalty could trigger double jeopardy protection if it were intended for punishment, but it nevertheless held that the statute was constitutional because the 50 percent addition to the tax was remedial, not punitive. *Id.*, at 398–405. Although the penalty at issue in *Mitchell* is arguably better characterized as a sanction for fraud than a tax, the Court described it interchangeably as a "sanction," *id.*, at 405, 406, an "addition to the tax," *id.*, at 405, an "assessment," *id.*, at 396, and a "tax," *id.*, at 398, making nothing of the potential import of the distinction.

revenue-raising, rather than punitive, purposes. Yet at some point, an exaction labeled as a tax approaches punishment, and our task is to determine whether Montana's drug tax crosses that line.

We begin by noting that neither a high rate of taxation nor an obvious deterrent purpose automatically marks this tax as a form of punishment. In this case, although those factors are not dispositive, they are at least consistent with a punitive character. A significant part of the assessment was more than eight times the drug's market value—a remarkably high tax.[17] That the Montana Legislature intended the tax to deter people from possessing marijuana is beyond question.[18] The DOR reminds us, however, that many taxes that are presumed valid, such as taxes on cigarettes and alcohol, are also both high and motivated to some

---

[17] The State recovered 1,811 ounces of marijuana with an estimated value of $46,000, and taxed the marijuana at $100 per ounce (that is, the greater of 10 percent of market value or $100 per ounce), for a total tax of $181,000. The State thus taxed the drugs at about 400 percent of their market value. Compared to similar taxes on legal goods and activities, Montana's tax—assessed at a rate of 10 percent or roughly 400 percent of market value, *whichever is greater*—appears to be unrivaled. Even the taxes identified by the United States, which supports the DOR as *amicus curiae*, do not approach a level this high. See Brief for United States as *Amicus Curiae* 23–24. The United States notes hypothetically, for example, that the current 24-cent-per-pack federal tax on cigarettes could, under a new health plan, be increased to 99 cents, resulting in a total tax burden that "could easily surpass" the 80 percent rate that Montana imposed on the part of the marijuana consisting of the higher valued "'buds.'" *Ibid.* The Government offers no such example, however, of a tax equivalent to that assessed on the combined cache of buds and lower valued "shake." See n. 12, *supra.*

[18] For example, although the Act's preamble evinces a clear motivation to raise revenue, it also indicates that the tax will provide for anticrime initiatives by "burdening" violators of the law instead of "law abiding taxpayers"; that use of dangerous drugs is not acceptable; and that the Act is not intended to "give credence" to any notion that manufacturing, selling, or using drugs is legal or proper. 1987 Mont. Laws, ch. 563, p. 1416.

extent by an interest in deterrence. Indeed, although no double jeopardy challenge was at issue, this Court sustained the steep $100-per-ounce federal tax on marijuana in *United States* v. *Sanchez*, 340 U. S. 42 (1950). Thus, while a high tax rate and deterrent purpose lend support to the characterization of the drug tax as punishment, these features, in and of themselves, do not necessarily render the tax punitive. Cf. *Sonzinsky* v. *United States*, 300 U. S. 506, 513–514 (1937).

Other unusual features, however, set the Montana statute apart from most taxes. First, this so-called tax is conditioned on the commission of a crime. That condition is "significant of penal and prohibitory intent rather than the gathering of revenue."[19] Moreover, the Court has relied on the absence of such a condition to support its conclusion that a particular federal tax was a civil, rather than a criminal, sanction.[20] In this case, the tax assessment not only hinges on the commission of a crime, it also is exacted only after the taxpayer has been arrested for the precise conduct that gives rise to the tax obligation in the first place.[21] Per-

---

[19] *United States* v. *Constantine*, 296 U. S. 287, 295 (1935) (concluding that a tax was motivated by penal instead of revenue-raising intent in part because the taxpayer had to pay an additional sum based on his illegal conduct). See also *United States* v. *La Franca*, 282 U. S., at 571, 575 (holding that a liquor tax assessed only against those prosecuted for illegal manufacture or sale of liquor was barred on statutory grounds, thus avoiding the "grave constitutional question" whether double jeopardy principles precluded such an assessment).

[20] In *Sanchez* we examined a federal marijuana tax, IRC § 2590–(a)(2) (since repealed, but last codified at 26 U. S. C. § 4741 *et seq.* (1964)), that taxed the transfer of marijuana to a person who has not paid a special tax and registered. Under the statute, the transferor's liability arose when the transferee failed to pay the tax; as a result, "[s]ince his tax liability does not in effect rest on criminal conduct, the tax can be properly called a civil rather than a criminal sanction." 340 U. S., at 45.

[21] This statute therefore does not raise the question whether an ostensibly civil proceeding that is designed to inflict punishment may bar a subsequent proceeding that is admittedly criminal in character. See JUSTICE

sons who have been arrested for possessing marijuana constitute the entire class of taxpayers subject to the Montana tax.

Taxes imposed upon illegal activities are fundamentally different from taxes with a pure revenue-raising purpose that are imposed *despite* their adverse effect on the taxed activity. But they differ as well from mixed-motive taxes that governments impose both to deter a disfavored activity and to raise money. By imposing cigarette taxes, for example, a government wants to discourage smoking. But because the product's benefits—such as creating employment, satisfying consumer demand, and providing tax revenues—are regarded as outweighing the harm, that government will allow the manufacture, sale, and use of cigarettes as long as the manufacturers, sellers, and smokers pay high taxes that reduce consumption and increase government revenue. These justifications vanish when the taxed activity is completely forbidden, for the legitimate revenue-raising purpose that might support such a tax could be equally well served by increasing the fine imposed upon conviction.[22]

---

SCALIA's dissent, *post*, at 804. Nor does the statute require us to comment on the permissibility of "multiple punishments" imposed in the same proceeding, cf. *Ex parte Lange,* 18 Wall. 163 (1874); *North Carolina* v. *Pearce,* 395 U. S. 711 (1969), since it involves separate sanctions imposed in *successive* proceedings.

[22] In this case, it is significant that the same sovereign that criminalized the activity also imposed the tax. Contrarily, most of our cases confirming that the unlawfulness of an activity does not prevent its taxation involve taxes on acts prohibited by other sovereigns. For example, *United States* v. *Constantine,* 296 U. S. 287 (1935), involved a federal excise tax on retail liquor sales that violated state law. *Id.,* at 293. Likewise, in *James* v. *United States,* 366 U. S. 213 (1961), a federal tax on embezzled money was imposed upon a man who had pleaded guilty in state court to conspiracy to embezzle. *Id.,* at 214. And *Marchetti* v. *United States,* 390 U. S. 39 (1968), involved a federal tax on gambling activities primarily prohibited under state law, though as the Court there noted, some federal statutes also prohibited activities ancillary to wagering. *Id.,* at 44–47. The importance of the distinction between same sovereign proceedings

The Montana tax is exceptional for an additional reason. Although it purports to be a species of property tax—that is, a "tax on the possession and storage of dangerous drugs," Mont. Code Ann. § 15–25–111 (1987)—it is levied on goods that the taxpayer neither owns nor possesses when the tax is imposed. Indeed, the State presumably *destroyed* the contraband goods in this case before the tax on them was assessed. If a statute that amounts to a confiscation of property is unconstitutional, *Heiner* v. *Donnan,* 285 U. S. 312, 326 (1932); *Nichols* v. *Coolidge,* 274 U. S. 531, 542 (1927), a tax on previously confiscated goods is at least questionable.[23] A tax on "possession" of goods that no longer exist and that the taxpayer never lawfully possessed has an unmistakable punitive character. This tax, imposed on criminals and no others, departs so far from normal revenue laws as to become a form of punishment.

Taken as a whole, this drug tax is a concoction of anomalies, too far removed in crucial respects from a standard tax assessment to escape characterization as punishment for the purpose of double jeopardy analysis.[24]

and dual sovereign proceedings also is borne out by our cases holding that the Constitution does not prohibit successive prosecutions by different sovereigns based on the same conduct. See, *e. g., Bartkus* v. *Illinois,* 359 U. S. 121 (1959) (state prosecution after federal); *Abbate* v. *United States,* 359 U. S. 187 (1959) (federal prosecution after state).

[23] Curiously, one of two alternative measures of the tax is the market value of a substance that cannot legally be marketed.

[24] Courts—including this Court in *United States* v. *Sanchez,* 340 U. S. 42 (1950)—have frequently commented on the punishing and deterrent nature of drug taxes. See, *e. g., Sims* v. *State Tax Comm'n,* 841 P. 2d 6, 13 (Utah 1992); *Rehg* v. *Illinois Dept. of Revenue,* 152 Ill. 2d 504, 515, 605 N. E. 2d 525, 531 (1992); *State* v. *Gallup,* 500 N. W. 2d 437, 445 (Iowa 1993); *State* v. *Roberts,* 384 N. W. 2d 688, 691 (S. D. 1986); *State* v. *Berberich,* 284 Kan. 854, 811 P. 2d 1192, 1200 (1991); *State* v. *Durrant,* 244 Kan. 522, 769 P. 2d 1174, 1181, cert. denied *sub nom. Dressel* v. *Kansas,* 492 U. S. 923 (1989).

## V

Because Montana's tax is fairly characterized as punishment, the judgment of the Court of Appeals must be affirmed. In *Halper*, we recognized that a civil penalty may be imposed as a remedy for actual costs to the State that are attributable to the defendant's conduct. 490 U. S., at 452. Yet as THE CHIEF JUSTICE points out, tax statutes serve a purpose quite different from civil penalties, and *Halper*'s method of determining whether the exaction was remedial or punitive "simply does not work in the case of a tax statute." *Post*, at 787 (dissenting opinion). Subjecting Montana's drug tax to *Halper*'s test for civil penalties is therefore inappropriate. Even if it were proper to permit such a showing, Montana has not claimed that its assessment in this case even remotely approximates the cost of investigating, apprehending, and prosecuting the Kurths, or that it roughly relates to any actual damages that they caused the State. And in any event, the formula by which Montana computed the tax assessment would have been the same regardless of the amount of the State's damages and, indeed, regardless of whether it suffered any harm at all.

This drug tax is not the kind of remedial sanction that may follow the first punishment of a criminal offense. Instead, it is a second punishment within the contemplation of a constitutional protection that has "deep roots in our history and jurisprudence," *Halper*, 490 U. S., at 440, and therefore must be imposed during the first prosecution or not at all. The proceeding Montana initiated to collect a tax on the possession of drugs was the functional equivalent of a successive criminal prosecution that placed the Kurths in jeopardy a second time "for the same offence."

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

CHIEF JUSTICE REHNQUIST, dissenting.

Without giving any indication that it is doing so, the Court's opinion drastically alters existing law. We have never previously subjected a tax statute to double jeopardy analysis, but under today's decision a state tax statute is struck down because its application violates double jeopardy. The Court starts off on the right foot. It correctly recognizes that our opinion in *United States* v. *Halper*, 490 U. S. 435 (1989), says nothing about the possible double jeopardy concerns of a tax, as opposed to a civil fine like the one confronted in *Halper*. *Ante*, at 777. I agree with the Court's rejection of the *Halper* mode of analysis, which, with its effort to determine whether a penalty statute is remedial or punitive, simply does not fit in the case of a tax statute. *Ante*, at 783. But the Court then goes astray and the end result of its decision is a hodgepodge of criteria—many of which have been squarely rejected by our previous decisions—to be used in deciding whether a tax statute qualifies as "punishment."

The Court cites the case of *Helvering* v. *Mitchell*, 303 U. S. 391 (1938), as one in which a tax statute was subjected to double jeopardy analysis. But I agree with the Court's statement that the "penalty at issue in *Mitchell* is arguably better characterized as a sanction for fraud than a tax." *Ante*, at 779, n. 16.[1] All of our other cases in this area of

---

[1] I disagree with the Court's statement that the *Mitchell* Court alternately characterized the penalty there in question as a tax. *Ante*, at 779, n. 16. The only language which was used by the *Mitchell* Court to which we are referred for this proposition is 303 U. S., at 398, where the Court uses the word "tax" three times, but only in the context of summarizing the parties' arguments. As for the first two times, the word "tax" is mentioned only in discussing the Government's argument that the indictment of Mitchell for willful evasion of the tax in question did not raise the same issue as did the civil proceeding for the fraud penalty for purposes of res judicata. The Court simply said:

"Since there was not even an adjudication that Mitchell did not wilfully attempt to evade or defeat the tax, it is not necessary to decide whether

the law involved claims of double jeopardy where a statute imposing what was denominated a "civil penalty" was invoked following a separate criminal proceeding based on an indictment for fraud. In *Mitchell, supra, United States ex rel. Marcus* v. *Hess*, 317 U. S. 537 (1943), and *Rex Trailer Co.* v. *United States*, 350 U. S. 148 (1956), the double jeopardy claim was rejected; in *United States* v. *Halper, supra,* a double jeopardy claim was upheld for the first time.

The Court, unlike the Court of Appeals below, wisely does not subject the Montana tax to the *Halper* analysis and it is thus unnecessary to determine whether *Halper* was correctly decided. See *post,* at 802–805 (SCALIA, J., dissenting). This clearly is not the "rare case" contemplated by *Halper,* nor does this tax involve a "fixed-penalty provision." *Halper, supra,* at 449. In *Halper,* we held that the double jeopardy test was whether or not the penalty statute there enabled the Government to recover more than an approxima- · tion of its costs in bringing the fraudulent actor to book, because compensation for the Government's loss is the avowed purpose of a civil penalty statute. But here we are confronted with a tax statute, and the purpose of a tax statute is not to recover the costs incurred by the Government for bringing someone to book for some violation of law, but is instead either to raise revenue or to deter conduct, or both. See, *e. g., Welch* v. *Henry,* 305 U. S. 134, 146 (1938); *Sonzinsky* v. *United States,* 300 U. S. 506, 513 (1937). Thus, despite JUSTICE O'CONNOR's attempt to view this case through the *Halper* lens, *post,* at 793, the reasoning quite properly employed in *Halper* to decide whether the exaction was reme-

such an adjudication would be decisive also of this issue of fraud." *Ibid.* The word "tax" is mentioned a third time in setting out the respondent's argument that "this proceeding is barred under the doctrine of double jeopardy because the 50 per centum addition . . . is not a tax, but a criminal penalty intended as punishment for allegedly fraudulent acts." *Ibid.* It is telling to note that the Court immediately thereafter denotes the 50% addition as a "sanction," and not a tax. *Id.,* at 398–399.

dial or punitive simply does not work in the case of a tax statute. Tax statutes need not be based on any benefit accorded to the taxpayer or on any damage or cost incurred by the Government as a result of the taxpayer's activities. *Commonwealth Edison Co.* v. *Montana*, 453 U. S. 609, 622 (1981). Thus, in analyzing the instant tax statute, the inquiry into the State's "damages caused by the [Kurths'] wrongful conduct," *post*, at 794 (O'CONNOR, J., dissenting), is unduly restrictive.

The proper question to be asked is whether the Montana drug tax constitutes a second punishment under the Double Jeopardy Clause for conduct already punished criminally. The Court asks the right question, *ante*, at 780, but reaches the wrong conclusion.

Taxes are customarily enacted to raise revenue to support the costs of government. Cf. *ante*, at 779–780 ("[T]axes are typically different [than fines, penalties, and forfeitures] because they are usually motivated by revenue-raising . . . purposes"). It is also firmly established that taxes may be enacted to deter or even suppress the taxed activity. Constitutional attacks on such laws have been regularly turned aside in our previous decisions. In *A. Magnano Co.* v. *Hamilton*, 292 U. S. 40 (1934), for example, the Court upheld against a due process challenge a steep excise tax imposed by the State of Washington on processors of oleomargarine during the depths of the depression. In *Sonzinsky* v. *United States, supra*, at 513, the Court upheld an annual federal firearms tax as a valid exercise of the taxing power of Congress. The Court there said "it has long been established that an Act of Congress which on its face purports to be an exercise of the taxing power is not any the less so because the tax is burdensome or tends to restrict or suppress the thing taxed." In *United States* v. *Sanchez*, 340 U. S. 42 (1950), the Court upheld the former federal tax on marijuana at the rate of $100 per ounce against a challenge that the tax was a penalty, rather than a true tax. In so doing, the Court

noted that "[i]t is beyond serious question that a tax does not cease to be valid merely because it regulates, discourages, or even definitely deters the activity taxed." *Id.*, at 44. And, as the Court concedes, *ante*, at 778–779, it is well settled that the unlawfulness of an activity does not prevent its taxation. *Marchetti* v. *United States*, 390 U. S. 39, 44 (1968); *United States* v. *Constantine*, 296 U. S. 287, 293 (1935).

The Court's opinion today gives a passing nod to these cases, but proceeds to hold that a high tax rate and a deterrent purpose "lend support to the characterization of the drug tax as punishment." *Ante*, at 781. The Court then discusses "[o]ther unusual features" of the Montana tax which, it concludes, brands this tax as a criminal penalty.

The Court first points to its conclusion that the so-called tax is conditioned on the commission of a crime, *ibid.*, a conclusion that the State disputes, and for good reason. The relevant provision of the rule, Mont. Admin. Rule 42.34.102(1) (1988), which provides that the tax return "shall be filed within 72 hours of . . . arrest," merely acknowledges the practical realities involved in taxing an illegal activity.[2] Then, quite contrary to the teachings of *Marchetti*, *Constantine*, and *James* v. *United States*, 366 U. S. 213 (1961), the Court states that the justifications for mixed-motive taxes—imposed both to deter and to raise revenue—vanish "when the taxed activity is completely forbidden." *Ante*, at 782.

---

[2] Other potential schemes for taxing illegal drug possession will face similar pitfalls. Because the activity sought to be taxed is illegal, individuals cannot be expected to voluntarily identify themselves as subject to the tax. The Minnesota scheme cited by respondents provides for the anonymous purchase of tax stamps prior to, and independent of, any criminal prosecution. Minn. Stat. § 297D.01 *et seq.* (1992). Not surprisingly, when asked at oral argument "Does Minnesota collect any money off that scheme . . . Not too many stamps being sold?," counsel for respondents admitted, amidst laughter, that he did not know the answer. Tr. of Oral Arg. 41.

A second "unusual feature" identified by the Court is that the tax is levied on drugs that the taxpayer neither owns or possesses at the time of taxation. But here, the Court exalts form over substance. Surely the Court is not suggesting that the State must permit the Kurths to keep the contraband in order to tax its possession. Cf. *Constantine, supra,* at 293 ("It would be strange if one carrying on a business the subject of an excise should be able to excuse himself from payment by the plea that in carrying on the business he was violating the law"). And although Montana's "Dangerous Drug Tax" is described as a tax on storage and possession, it is clear from the structure and purpose of the Act that it was passed for the legitimate purpose of raising revenue from the profitable underground drug business. 1987 Mont. Laws, ch. 563 (preamble).[3]

I do not dispute the Court's conclusion that an assessment which is labeled a "tax" could, under some conceivable cir-

---

[3] The preamble to the 1987 Montana Dangerous Drug Tax Act provides:

"WHEREAS, dangerous drugs are commodities having considerable value, and the existence in Montana of a large and profitable dangerous drug industry and expensive trade in dangerous drugs is irrefutable; and

"WHEREAS, the state does not endorse the manufacturing of or trading in dangerous drugs and does not consider the use of such drugs to be acceptable, but it recognizes the economic impact upon the state of the manufacturing and selling of dangerous drugs; and

"WHEREAS, it is appropriate that some of the revenue generated by this tax be devoted to continuing investigative efforts directed toward the identification, arrest, and prosecution of individuals involved in conducting illegal continuing criminal enterprises that affect the distribution of dangerous drugs in Montana.

"THEREFORE, the Legislature of the State of Montana does not wish to give credence to the notion that the manufacturing, selling, and use of dangerous drugs is legal or otherwise proper, but finds it appropriate in view of the economic impact of such drugs to tax those who profit from drug-related offenses and to dispose of the tax proceeds through providing additional anticrime initiatives without burdening law abiding taxpayers."

Funds collected from the tax are earmarked for youth evaluations, chemical abuse assessment and aftercare, and juvenile detention facilities. Mont. Code Ann. § 15–25–122 (1993).

cumstances, constitute "punishment" for purposes of the Double Jeopardy Clause. *Ante,* at 778, and n. 15, 779. The Court made a similar finding in *United States* v. *Constantine, supra,* although in the context of a different sort of challenge. At issue in that case was the validity of a special $1,000 excise tax levied against all persons dealing in the liquor business contrary to local law. *Id.,* at 289, n. 1. In striking down the tax as an unlawful penalty rather than a tax, the Court noted that the assessment was conditioned on the imposition of a crime, and that it was "highly exorbitant." *Id.,* at 295.

But the *Constantine* factors are not persuasive in the present context. As discussed above, I do not find the conditioning of the tax on criminal conduct and arrest to be fatal to this tax's validity; this characteristic simply reflects the reality of taxing an illegal enterprise. Furthermore, the rate of taxation clearly supports petitioner here. In *Constantine,* the special $1,000 excise tax on the sale of alcohol was 40 times as great when compared to the otherwise applicable $25 fee for retail liquor dealers such as respondent. *Ibid.* When compared to the Montana tax, two points are noteworthy. First, unlike the situation in *Constantine,* no tax or fee is otherwise collected from individuals engaged in the illicit drug business. Thus, an entire business goes without taxation. Second, the Montana tax is not as disproportionate as the additional excise tax in *Constantine.* The Court makes much of the fact that the bulk of the assessment— that imposed on the low-grade "shake"—was more than eight times the market value of the drug. *Ante,* at 780. But the Court glosses over the fact that the tax imposed on the higher quality "bud" amounted to only 80% of that product's market value.[4]

---

[4] The Kurths were taxed for their possession of 130 ounces of marijuana "bud," a substance of higher quality than the marijuana "shake." The Bankruptcy Court found that the bud had a market value of approximately

After averaging the effective tax rates on the two marijuana products, the Court concludes that Montana's tax rate of four times the market value appears to be "unrivaled." *Ante,* at 780, n. 17. That may be so. But the proper inquiry is not whether the tax rate is "unrivaled," but whether it is so high that it can only be explained as serving a punitive purpose. When compared to similar types of "sin" taxes on items such as alcohol and cigarettes, these figures are not so high as to be deemed arbitrary or shocking. This is especially so given both the traditional deference accorded to state authorities regarding matters of taxation, and the fact that a substantial amount of the illegal drug business will escape taxation altogether.[5]

In short, I think the Court's conclusion that the tax here is a punishment is very much at odds with the purpose and effect of the Montana statute, as well as our previous decisions. After reviewing the structure and language of the tax provision and comparing the rate of taxation with similar types of sin taxes imposed on lawful products, I would reach the contrary conclusion—that the Montana tax has a nonpenal purpose of raising revenue, as well as the legitimate purpose of deterring conduct, such that it should be regarded as a genuine tax for double jeopardy purposes.

---

$2,000 per pound. The product was taxed at a minimum rate of $100 per ounce ($1,600 per pound), or 80% of market value.

[5] The federal tax on cigarettes is currently at 1.2 cents per cigarette, or 24 cents per package. 26 U. S. C. § 5701(b). While this does not exceed the cost of a pack of cigarettes, the current proposal to boost the cigarette tax to 99 cents per pack could lead to a total tax on cigarettes in some jurisdictions at a rate higher than the 80% rate utilized in this case for the marijuana bud. That the shake is taxed at a higher rate is consistent with the effect of a fixed rate tax on a very low-quality, inexpensive product. See 26 U. S. C. § 4131(b)(1) (fixed tax on vaccines, ranging from 6 cents to $4.56 per dose); 26 U. S. C. § 4681 (1988 ed., Supp. IV) (fixed tax on ozone-depleting chemicals).

JUSTICE O'CONNOR, dissenting.

In an attempt to save their ranch from creditors, the extended Kurth family turned to marijuana farming. "The business expanded to the largest marijuana growing operation in the State of Montana when shut down by law enforcement authorities in October, 1987." *In re Kurth Ranch*, 145 B. R. 61, 66 (Bkrtcy. Ct. Mont. 1990). The Kurths were convicted and sentenced on various state drug charges.

During the raid on the ranch, authorities found 1,811 ounces of harvested marijuana in the Kurths' possession. Under Montana law, "[t]here is a tax on the possession and storage of dangerous drugs," and "each person possessing or storing dangerous drugs is liable for the tax." Mont. Code Ann. § 15–25–111(1) (1987). In the case of marijuana, the tax is 10 percent of the market value of the drugs or $100 per ounce, whichever is greater. § 15–25–111(2). Pursuant to this law, the Montana Department of Revenue assessed a tax of $181,000 against the Kurths. The Kurths argue, and the courts below agreed, that this tax is a second punishment prohibited by the Double Jeopardy Clause. See *Schiro* v. *Farley*, 510 U. S. 222, 229 (1994) (the Clause " 'protects against multiple punishments for the same offense,' " quoting *North Carolina* v. *Pearce*, 395 U. S. 711, 717 (1969)).

The government may, of course, tax illegal activity. See, *e. g., Marchetti* v. *United States*, 390 U. S. 39, 44 (1968). In fact, we have upheld, as within Congress' taxing authority, a $100 per ounce tax on marijuana. *United States* v. *Sanchez*, 340 U. S. 42, 44 (1950). But the power to tax illegal activity carries with it the danger that the legislature will use the tax to punish the participants for engaging in that activity. This is particularly true of taxes assessed on the possession of illegal drugs: Because most drug offenses involve the manufacture, possession, transportation, or distribution of controlled substances, the State might use a tax on possession to punish a participant in a drug crime twice for the same conduct. We would certainly examine a $100 per ounce *fine*

levied against a person who had previously been convicted and sentenced for marijuana possession for consistency with the Double Jeopardy Clause. Cf. *United States ex rel. Marcus* v. *Hess*, 317 U. S. 537, 548–549 (1943). Because in my view there is no constitutional distinction between such a fine and the tax at issue in this case, a tax imposed on the possession of illegal drugs is subject to double jeopardy analysis.

To hold, however, that Montana's drug tax is not *exempt* from scrutiny under the Double Jeopardy Clause says nothing about whether imposition of the tax is unconstitutional. "Congress may impose both a criminal and a civil sanction in respect to the same act or omission; for the double jeopardy clause prohibits merely *punishing* twice, or attempting a second time to punish criminally, for the same offense." *Helvering* v. *Mitchell*, 303 U. S. 391, 399 (1938) (emphasis added). The Fifth Amendment says "nor shall any person be subject for the same offence to be twice put in jeopardy," and a civil proceeding following a criminal prosecution simply is not a second "jeopardy." See *post*, at 801, and n. 1 (SCALIA, J., dissenting). But we have recognized that the Constitution constrains the States' ability to denominate proceedings as "civil" and so dispense with the criminal procedure protections embodied in the Bill of Rights. See, *e. g.*, *Allen* v. *Illinois*, 478 U. S. 364, 368–369 (1986). Some governmental exactions are so punitive that they may only be imposed in a criminal proceeding. *United States* v. *Ward*, 448 U. S. 242, 248–249 (1980). And because the Double Jeopardy Clause prohibits successive criminal proceedings for the same offense, the government may not sanction a defendant for conduct for which he has already been punished *insofar as the subsequent sanction is punitive*, because to do so would necessitate a criminal proceeding prohibited by the Constitution. See generally *United States* v. *Halper*, 490 U. S. 435 (1989).

The question, then, is whether Montana's drug tax is punitive. Our double jeopardy cases make clear that a civil sanction will be considered punishment to the extent that it serves only the purposes of retribution and deterrence, as opposed to furthering any nonpunitive objective. *Id.*, at 448–450. See also *Bell* v. *Wolfish*, 441 U. S. 520, 539, n. 20 (1979); *Kennedy* v. *Mendoza-Martinez*, 372 U. S. 144, 168 (1963). This will obtain when, as in *Halper*, the amount of the sanction is "overwhelmingly disproportionate" to the damages caused by the wrongful conduct and thus "is not rationally related to the goal of making the Government whole." 490 U. S., at 449, 451.

The State and Federal Governments spend vast sums on drug control activities. See, *e. g.*, U. S. Dept. of Justice, Bureau of Justice Statistics, Fact Sheet: Drug Data Summary 5 (Apr. 1994) (approximately $27 billion in fiscal year 1991). The Kurths are directly responsible for some of these expenditures—the costs of detecting, investigating, and raiding their operation, the price of prosecuting them and incarcerating those who received prison sentences, and part of the money spent on drug abuse education, deterrence, and treatment. The State of Montana has a legitimate nonpunitive interest in defraying the costs of such activities. *United States* v. *Halper, supra*, at 444–446, and n. 6; see also *United States* v. *Ward, supra*, at 254; *One Lot Emerald Cut Stones* v. *United States*, 409 U. S. 232, 237 (1972); *Rex Trailer Co.* v. *United States*, 350 U. S. 148, 153–154 (1956). For example, readily available statistics indicate that apprehension, prosecution, and incarceration of the Kurths will cost the State of Montana at least $120,000. See Montana Board of Crime Control, Per-Unit and Per-Transaction Expenditures in the Montana Criminal Justice System 8, 15, 19, 21, 22–23, and Tables 21 and 23 (1993) (Montana Criminal Justice Expenditures).

But measuring the costs actually imposed by every participant in the illegal drug trade would be, to the extent it is

even possible, so complex as to make the game not worth the candle. Thus, the government must resort to approximation—in effect, it exacts liquidated damages. See *Rex Trailer Co.* v. *United States, supra,* at 153–154 ("The damages resulting from [the government's] injury may be difficult or impossible to ascertain, but it is the function of liquidated damages to provide a measure of recovery in such circumstances"); *United States* v. *Halper, supra,* at 452–453 (KENNEDY, J., concurring) ("Our rule permits the imposition in the ordinary case of at least a fixed penalty roughly proportionate to the damage caused or a reasonably liquidated amount"). The Montana Legislature has determined that $100 per ounce of marijuana is an appropriate estimate of its costs of drug control, and at least 22 other States have made a similar determination and tax marijuana at approximately the same rate.*

The Court of Appeals recognized that imposition of the drug tax on the Kurths' possession of marijuana would not be punishment if the sanction bore some rational relationship to "the staggering costs associated with fighting drug abuse in this country." *In re Kurth Ranch,* 986 F. 2d 1308, 1312 (CA9 1993). But the court held that "allowing the state to impose this tax, *without any showing of some rough approximation of its actual damages and costs,* would be sanction-

---

*See Ala. Code § 40–17A–8(1) (1993); Colo. Rev. Stat. § 39–28.7–102(1) (Supp. 1993); Conn. Gen. Stat. § 12–651(b)(1) (1993); Ga. Code Ann. § 48–15–6(1) (Supp. 1993); Idaho Code § 63–4203(2)(a) (Supp. 1993); Ill. Comp. Stat. § 520/9(1) (1993); Iowa Code § 453B.7(1) (Supp. 1994); Kan. Stat. Ann. § 79–5202(a)(1) (Supp. 1990); La. Rev. Stat. Ann. § 47:2601(1) (West Supp. 1994); Me. Rev. Stat. Ann., Tit. 36, § 4434(1) (Supp. 1993); Mass. Gen. Laws ch. 64K, § 8(1) (Supp. 1994); Minn. Stat. § 297D.08(1) (1991); Neb. Rev. Stat. § 77–4303(1)(a) (1990); Nev. Rev. Stat. § 372A.070(b)(1) (1993); N. M. Stat. Ann. § 7–18A–3A(5) (1993); N. C. Gen. Stat. § 105–113.107(1) (1992); N. D. Cent. Code § 57–36.1–08(1) (1993); Okla. Stat., Tit. 68, § 450.2(1) (1992); R. I. Gen. Laws § 44–49–9(1) (Supp. 1993); Tex. Tax Code Ann. § 159.101(b)(2) (1992); Utah Code Ann. § 59–19–103(1)(a) (1992); Wis. Stat. § 139.88(1) (Supp. 1993).

ing a penalty which *Halper* prohibits." *Ibid.* (emphasis added). As evidenced by the highlighted phrase, the Court of Appeals skipped a step in the double jeopardy analysis. In *Halper*, we held that determining whether an exaction is punitive entails a two-part inquiry:

> "Where a defendant previously has sustained a criminal penalty and the civil penalty sought in the subsequent proceeding bears no rational relation to the goal of compensating the Government for its loss, but rather appears to qualify as 'punishment' in the plain meaning of the word, *then* the defendant is entitled to an accounting of the Government's damages and costs to determine if the penalty sought *in fact* constitutes a second punishment." 490 U. S., at 449–450 (emphasis added).

In other words, the defendant must first show the absence of a rational relationship between the amount of the sanction and the government's nonpunitive objectives; the burden then shifts to the government to justify the sanction with reference to the particular case. This bifurcated approach to the double jeopardy question makes good sense. The presumption of constitutionality to which every state statute is entitled means in this context that a sanction denominated as civil must be presumed to be nonpunitive. This presumption would be rendered nugatory if the government were required to prove that the sanction is in fact nonpunitive before imposing it in a particular case. Rather, the defendant must show that the sanction may be punitive as applied to him before the government can be required to justify its imposition. As we emphasized in *Halper*, it will be the "rare case" in which a litigant will succeed in satisfying the first prong of the constitutional analysis. *Id.*, at 449. We do not know whether this is such a case because the courts below improperly faulted the State for failing to prove its actual damages even though the Kurths have not shown that

the amount of the tax is not rationally related to the government's legitimate nonpunitive objectives.

The Court avoids this problem by asserting that "[s]ubjecting Montana's drug tax to *Halper*'s test for civil penalties is . . . inappropriate." *Ante*, at 784. To reach this conclusion, the Court holds that imposition of the drug tax is *always* punitive, regardless of the nature of the offense or the offender. The consequences of this decision are astounding. The State of Montana—along with about half of the other States—is now precluded from *ever* imposing the drug tax on a person who has been punished for a possessory drug offense. A defendant who is arrested, tried, and convicted for possession of one ounce of marijuana cannot be taxed $100 therefor, even though the State's law enforcement costs in such a case average more than $4,000. See Montana Criminal Justice Expenditures 24. Moreover, presumably the State cannot tax *anyone* for possession of illegal drugs without providing the full panoply of criminal procedure protections found in the Fifth and Sixth Amendments, given the Court's holding that "[t]he proceeding Montana initiated to collect a tax on the possession of drugs was the functional equivalent of a successive criminal prosecution." *Ibid.* See *United States* v. *Ward*, 448 U. S., at 248; *post*, at 807 (SCALIA, J., dissenting).

Today's decision is entirely unnecessary to preserve individual liberty, because the Excessive Fines Clause is available to protect criminals from governmental overreaching. See *Alexander* v. *United States*, 509 U. S. 544 (1993); *Austin* v. *United States*, 509 U. S. 602 (1993); *post*, at 803, n. 2 (SCALIA, J., dissenting). See also *Browning-Ferris Industries of Vt., Inc.* v. *Kelco Disposal, Inc.*, 492 U. S. 257, 283–284 (1989) (O'CONNOR, J., concurring in part and dissenting in part) (discussing incorporation of Excessive Fines Clause). On the other hand, today's decision will be felt acutely by law-abiding taxpayers, because it will seriously undermine the ability of the State and Federal Governments to collect

recompense for the immense costs criminals impose on our society. I therefore respectfully dissent from the Court's unwarranted expansion of our double jeopardy jurisprudence. I would simply vacate the judgment below and remand the case for further proceedings consistent with this opinion and *Halper.*

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, dissenting.

The Double Jeopardy Clause of the Fifth Amendment provides: "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb."

## I

"To be put in jeopardy" does not remotely mean "to be punished," so by its terms this provision prohibits, not multiple punishments, but only multiple prosecutions. Compare the proposal of the House of Representatives, for which the Senate substituted language similar to the current text of the Clause: "No person shall be subject, except in cases of impeachment, to more than one punishment or one trial for the same offence." See 1 Annals of Cong. 434, 753, 767 (1789); Senate Journal, Aug. 24, 1789, 1st Cong., 1st Sess., 105, 119, 130 (1789). The view that the Double Jeopardy Clause does not prohibit multiple punishments is, as Justice Frankfurter observed,

> "confirmed by history. For legislation . . . providing two sanctions for the same misconduct, enforceable in separate proceedings, one a conventional criminal prosecution, and the other a forfeiture proceeding or a civil action as upon a debt, was quite common when the Fifth Amendment was framed by Congress. . . . It would do violence to proper regard for the framers of the Fifth Amendment to assume that they contemporaneously enacted and continued to enact legislation that was offensive to the guarantees of the double jeopardy clause

which they had proposed for ratification." *United States ex rel. Marcus* v. *Hess,* 317 U. S. 537, 555–556 (1943) (concurring opinion).

The belief that there is a multiple-punishments component of the Double Jeopardy Clause can be traced to *Ex parte Lange,* 18 Wall. 163 (1874). In that case, the lower court sentenced Lange to both one year of imprisonment *and* a $200 fine for stealing mail bags from the Post Office, under a statute that authorized a maximum sentence of one year of imprisonment *or* a fine not to exceed $200. The Court, acknowledging that the sentence was in excess of statutory authorization, issued a writ of habeas corpus. *Lange* has since been cited as though it were decided exclusively on the basis of the Double Jeopardy Clause, see, *e. g., North Carolina* v. *Pearce,* 395 U. S. 711, 717, and n. 11 (1969); in fact, Justice Miller's opinion for the Court rested the decision on principles of the common law, and both the Due Process and Double Jeopardy Clauses of the Fifth Amendment. See *Lange,* 18 Wall., at 170, 176, 178. The opinion went out of its way *not* to rely exclusively on the Double Jeopardy Clause, in order to avoid deciding whether it applied to prosecutions not literally involving "life or limb." See *id.,* at 170. It is clear that the Due Process Clause alone suffices to support the decision, since the guarantee of the process provided by the law of the land, cf. *Pacific Mut. Life Ins. Co.* v. *Haslip,* 499 U. S. 1, 28–29 (1991) (SCALIA, J., concurring in judgment), assures prior legislative authorization for whatever punishment is imposed.

The basis for *Lange* was hardly clarified when, almost three-quarters of a century later and in a case involving nearly identical circumstances (a prisoner who had already paid a $500 fine was sentenced to prison under a contempt statute that permitted only a fine *or* imprisonment), the Court discharged the prisoner without express reference to the. Double Jeopardy Clause and with only a citation of *Lange.* See *In re Bradley,* 318 U. S. 50, 51–52 (1943). Chief

Justice Stone's dissent in *Bradley* displays his uncertainty regarding the doctrinal basis for *Lange*—as well as his view that if the basis was the Double Jeopardy Clause it was wrong: "So far as *Ex parte Lange* is regarded here as resting on the ground that it would be double jeopardy to compel the offender to serve the prison sentence after remission of the fine on the same day on which it was paid, I think its authority should be reexamined and rejected." 318 U. S., at 53.

Between *Lange* and our decision five Terms ago in *United States* v. *Halper*, 490 U. S. 435 (1989), our cases often stated that the Double Jeopardy Clause protects against both successive prosecutions and successive punishments for the same criminal offense. See, *e. g., North Carolina* v. *Pearce, supra,* at 717; *Illinois* v. *Vitale,* 447 U. S. 410, 415 (1980); *Ohio* v. *Johnson,* 467 U. S. 493, 498–499 (1984). But the repetition of a dictum does not turn it into a holding, and an examination of the cases discussing the prohibition against multiple punishments demonstrates that, until *Halper,* the Court never invalidated a *legislatively authorized* successive punishment. The dispositions were entirely consistent with the proposition that the restriction derived exclusively from the due process requirement of legislative authorization. Indeed, some cases expressed the restriction in precisely that fashion. See, *e. g., Johnson, supra,* at 499, and n. 8 ("[P]rotection against cumulative punishmen[t] is designed to ensure that the sentencing discretion of courts is confined to the limits established by the legislature"); *Albernaz* v. *United States,* 450 U. S. 333, 344 (1981) ("[T]he question of what punishments are constitutionally permissible is not different from the question of what punishments the Legislative Branch intended to be imposed"); *United States* v. *DiFrancesco,* 449 U. S. 117, 139 (1980) ("No double jeopardy problem would have been presented in *Ex parte Lange* if Congress had provided that the offense there was punishable by both fine and imprisonment, even though that is mul-

tiple punishment"); *Whalen* v. *United States*, 445 U. S. 684, 688 (1980) ("[T]he question whether punishments imposed by a court after a defendant's conviction upon criminal charges are unconstitutionally multiple cannot be resolved without determining what punishments the Legislative Branch has authorized"); *id.*, at 697 (BLACKMUN, J., concurring in judgment) ("The *only* function the Double Jeopardy Clause serves in cases challenging multiple punishments is to prevent the prosecutor from bringing more charges, and the sentencing court from imposing greater punishments, than the Legislative Branch intended") (emphasis in original); *Brown* v. *Ohio*, 432 U. S. 161, 165 (1977) ("The legislature remains free under the Double Jeopardy Clause to define crimes and fix punishments").

To tell the truth, however, until *Halper* was decided, extending the "no-double-punishments" rule to *civil* penalties, it did not much matter whether that rule was a freestanding constitutional prohibition implicit in the Double Jeopardy Clause or (as I think to be the case) merely an aspect of the Due Process Clause requirement of legislative authorization. Even if it were thought to be the former, the Double Jeopardy Clause's ban on successive criminal prosecutions would make surplusage of any distinct protection against additional punishment imposed in a *successive prosecution,* since the prosecution *itself* would be barred.[1] (It has never been imagined, of course, that the commonplace practice of imposing multiple authorized punishments—fine and incarceration—after a *single* prosecution is unconstitutional. See

---

[1] Thus, in the context of criminal proceedings, legislatively authorized multiple punishments are permissible if imposed in a single proceeding, but impermissible if imposed in successive proceedings. See *Missouri* v. *Hunter,* 459 U. S. 359, 368–369 (1983). *United States* v. *Halper,* 490 U. S. 435, 450 (1989), and the Court's opinion in the present case, see *ante,* at 778, attempt to preserve that distinction in the context of civil proceedings. But of course the textual basis for it—the Double Jeopardy Clause's prohibition of successive prosecutions—does not exist: a civil proceeding is not a second jeopardy. See *infra,* at 807–808.

*DiFrancesco, supra,* at 139.) But a *civil* proceeding successive to a criminal prosecution is *not* barred, even if (as in *Halper* itself) it has the potential to result in the imposition of a penalty. See *United States* v. *One Assortment of 89 Firearms,* 465 U. S. 354, 362 (1984); *One Lot Emerald Cut Stones* v. *United States,* 409 U. S. 232, 235 (1972). Thus, by extending the no-double-punishments rule to civil penalties, while simultaneously affirming that it demanded more than mere fidelity to legislative intent, *Halper* gave the rule a breadth of effect it had never before enjoyed.

*Halper* involved a medical doctor who had already been convicted and punished under the criminal false claims statute, 18 U. S. C. § 287, for filing false medicare claims. The issue was whether he could then be fined for the same false claims under the civil provisions of the False Claims Act, 31 U. S. C. §§ 3729–3731. We held that the Double Jeopardy Clause prevented it, to the extent that the fine exceeded what was needed to cover "'legitimate nonpunitive governmental objectives,'" *Halper,* 490 U. S., at 448, quoting *Bell* v. *Wolfish,* 441 U. S. 520, 539, n. 20 (1979). The Government's contention in *Halper* was not that no constitutional prohibition on multiple punishments existed, but rather that it applied only to punishments meted out in a criminal proceeding. See Brief for United States in *United States* v. *Halper,* O. T. 1988, No. 87–1383, pp. 11–12, 21–24. I found, and continue to find, that distinction incoherent: if the Constitution prohibits multiple punishments, the nature of the proceeding in which punishment is imposed should make no difference. Accordingly, I joined the Court's unanimous opinion. I continued to apply the rule of *Halper*—indeed, I thought I applied it more faithfully than the Court—in my dissent the next month in *Jones* v. *Thomas,* 491 U. S. 376, 388, 393 (1989).

The difficulty of applying *Halper*'s analysis to Montana's Dangerous Drug Tax has prompted me to focus on the antecedent question whether there *is* a multiple-punishments

component of the Double Jeopardy Clause. As indicated above, I have concluded—as did Chief Justice Stone, see *In re Bradley*, 318 U. S. 50 (1943), and Justice Frankfurter, see *United States ex rel. Marcus* v. *Hess*, 317 U. S. 537 (1943)—that there is not. Instead, the Due Process Clause keeps punishment within the bounds established by the legislature, and the Cruel and Unusual Punishments and Excessive Fines Clauses place substantive limits upon what those legislated bounds may be.[2]

Of course the conviction that *Halper* was in error is not alone enough to justify departing from it. But there is added to that conviction the knowledge, acquired from brief experience with the new regime, that the erroneous holding produces results too strange for judges to endure, and regularly demands judgments of the most problematic sort. As to the latter: We dodged the bullet in *Halper*—or perhaps a more precise metaphor would be that we thrust our lower-court colleagues between us and the bullet—by leaving it to the lower courts to determine at what particular dollar level the civil fine exceeded the Government's "legitimate nonpunitive governmental objectives" and thus became a penalty. See *Halper*, 490 U. S., at 452. In the present case, however, the alleged punishment is not an adjudicated fine that can be judicially reduced to a lower level, but rather a tax; and so we grapple with the different, though no less peculiar, inquiry: When is a tax so high (or so something-else) that it is a punishment? Surely further enigmas await us.

---

[2] The Excessive Fines Clause—which was rescued from obscurity only after *Halper* was decided, see *Alexander* v. *United States*, 509 U. S. 544, 558–559 (1993) (first Supreme Court case applying the Clause to *in personam* criminal proceedings); *Austin* v. *United States*, 509 U. S. 602, 606–618 (1993) (Clause applies to civil forfeitures)—may well support the judgment in *Halper*. Indeed, it may even *explain* the judgment in *Halper*, since much of the language of that opinion suggests that the Court was motivated by concern for the harsh consequences of applying a per-transaction penalty to a "prolific but small-gauge offender," 490 U. S., at 449.

And we have also learned from experience that we are unwilling to take the strong (and not particularly healthful) medicine that we poured out for ourselves in *Halper*. *Jones* was the first lesson; but even sterner ones are in store. In the present case, as in *Halper* itself, we confront the relatively easy task of disallowing a *civil* sanction because *criminal* punishment has already been imposed. But many cases, including one being held for this case, will demand much more of us: disallowing *criminal* punishment because a *civil* sanction has already been imposed. Although at least one lower court has optimistically suggested (without elaborating) that there might be a constitutional difference between the two situations, see *United States* v. *Newby*, 11 F. 3d 1143 (CA3 1993), if there is a constitutional prohibition on multiple punishments, the order of punishment cannot possibly make any difference. Accord, *United States* v. *Sanchez-Escareno*, 950 F. 2d 193, 200 (CA5 1991). The social cost of vindicating the fictional, *Halper*-created multiple-punishments prohibition will be much higher when criminal penalties are at stake, and we will be no more willing to pay it (nor should we) than the lower courts have been. Can a prison inmate who has been disciplined for an altercation with a guard subsequently be punished criminally for the same incident? See *Newby, supra,* at 1145–1146 (answering yes). Can a person who has paid a $75,000 fine and been permanently disbarred from commodity trading because of trading violations subsequently be sent to jail for the same violations? See *United States* v. *Furlett*, 974 F. 2d 839 (CA7 1992) (answering yes). Can a person who has suffered civil forfeiture for violation of law later be prosecuted criminally for the same violation? See *United States* v. *Tilley*, 18 F. 3d 295 (CA5 1994) (answering yes).

It is time to put the *Halper* genie back in the bottle, and to acknowledge what the text of the Constitution makes perfectly clear: the Double Jeopardy Clause prohibits successive

prosecution, not successive punishment. Multiple punishment is of course restricted by the Cruel and Unusual Punishments Clause insofar as its nature is concerned, and by the Excessive Fines Clause insofar as its cumulative extent is concerned. Its multiplicity *qua* multiplicity, however, is restricted only by the Double Jeopardy Clause's requirement that there be no successive criminal prosecution, and by the Due Process Clause's requirement that the cumulative punishments be in accord with the law of the land, *i. e.*, authorized by the legislature.

## II

The Court's entire opinion appears to proceed on the assumption that the relevant question is whether taxes assessed pursuant to Montana's Dangerous Drug Tax Act "violate the constitutional prohibition against successive punishments for the same offense." *Ante*, at 769. Nonetheless, after 16 pages addressing how Montana's marijuana tax inflicts punishment, the Court adds, almost as an afterthought: "The proceeding Montana initiated to collect a tax on the possession of drugs was the functional equivalent of a successive criminal prosecution that placed the Kurths in jeopardy a second time 'for the same offence.'" *Ante*, at 784.

The only conceivable foundation for that statement is the implicit assumption that any proceeding which imposes "punishment" within the meaning of the multiple-punishments component of the Double Jeopardy Clause is a criminal prosecution. That assumption parts company with a long line of cases, including *Halper*, without even the courtesy of a goodbye. Although a few of our cases include statements to the effect that a proceeding in which punishment is imposed is criminal, see, *e. g., Kennedy* v. *Mendoza-Martinez,* 372 U. S. 144, 167 (1963), the criterion of "punishment" for *that* purpose is significantly different (and significantly more deferential to the government) than the criterion applied in

*Halper.* *United States* v. *Ward,* 448 U. S. 242 (1980), put it this way:

> "[W]here Congress has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect as to negate that intention. In regard to this latter inquiry, we have noted that 'only the clearest proof could suffice to establish the unconstitutionality of a statute on such a ground.'" *Id.,* at 248–249, quoting *Flemming* v. *Nestor,* 363 U. S. 603, 617 (1960) (citation omitted).

*Halper*'s focus on whether the sanction serves the goals of "retribution and deterrence" is just one factor in the *Kennedy-Ward* test, see 372 U. S., at 168–169, and one factor alone is not dispositive, see *Ward, supra,* at 250–251.

The greater severity of the "criminal prosecution" test is in fact precisely why *Halper* resorted to the multiple-punishments component of the Double Jeopardy Clause. The opinion distinguished between the test used to determine "whether proceedings are criminal or civil," 490 U. S., at 447, and the more searching analysis thought appropriate in the multiple-punishments context:

> "The Government correctly observes that this Court has followed this abstract *[Kennedy-Ward]* approach when determining whether the procedural protections of the Sixth Amendment apply to proceedings under a given statute, in affixing the appropriate standard of proof for such proceedings, and in determining whether double jeopardy protections should be applied. See *United States* v. *Ward,* 448 U. S., at 248–251. But while recourse to statutory language, structure, and intent is appropriate in identifying the inherent nature of a proceeding, or in determining the constitutional safeguards that must accompany those proceedings as a general

matter, the approach is not well suited to the context of the 'humane interests' safeguarded by the Double Jeopardy Clause's proscription of multiple punishments." *Ibid.*

The Court not only ignores the *Kennedy-Ward* test and this portion of *Halper*, it also does not attempt to reconcile its conclusion with our decision in *Helvering* v. *Mitchell*, 303 U. S. 391 (1938):

"Forfeiture of goods or their value and the payment of fixed or variable sums of money are other sanctions which have been recognized as enforcible *[sic]* by civil proceedings since the original revenue law of 1789. In spite of their comparative severity, such sanctions have been upheld against the contention that they are essentially criminal and subject to the procedural rules governing criminal prosecutions." *Id.,* at 400 (citation omitted) (citing cases).

Of course, if the Court were correct that the proceeding below was criminal in nature, there would be no particular reason to refer to this as a double jeopardy case. Assessment of a criminal punishment in a civil tax proceeding would violate not only the Double Jeopardy Clause, but all of the criminal-procedure guarantees of the Fifth and Sixth Amendments. And it would be invalid *whether or not* it was preceded by a traditional criminal prosecution. The Court's assertion that it would be lawful in isolation, see *ante,* at 778–779, thus contradicts the Court's contention that it is "the functional equivalent of a . . . criminal prosecution," *ante,* at 784.

\*     \*     \*

Applying the *Kennedy-Ward* test to the Montana tax proceeding, I do not find that it constituted a second criminal prosecution. And since the Montana Legislature authorized

these taxes *in addition to* the criminal penalties for possession of marijuana, these taxes did not violate that principle of due process sometimes called the multiple-punishments component of the Double Jeopardy Clause. The Constitution requires nothing more. For these reasons, I respectfully dissent.