**Ex parte Henry David HERNANDEZ.**

**Nos. 1025–95, 1024–95.**

Court of Criminal Appeals of Texas, En Banc.

Sept. 24, 1997.

Mark Stevens, San Antonio, for appellant.

Edward F. Shaughnessy, III, Asst. Dist. Atty., San Antonio, Matthew Paul, State's Atty., Austin, for the State.

Before the court en banc.

*OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW*

HOLLAND, Judge.

Appellant was indicted for aggravated assault on a jail guard and aggravated assault on a peace officer.[1]  TEX. PENAL CODE

---

1.  In Cause No. 1024–95, appellant was originally indicted for aggravated assault on a peace officer.  At appellant's pre-trial hearing, the trial court granted the State's motion to amend the indictment to list the victim as "Roger Ybarra, ..., who was a jailer at the Bexar County Adult Detention Center...".  Therefore, the offense in Cause No. 1024–95 became aggravated assault on a jail guard.  However, in Cause No. 1025–95, the State did not seek to amend the indictment.  The victim in Cause No. 1025–95 is still described as "Terry Payton, ..., who was a peace officer..." Therefore, the indictment in Cause No.

ANN. § 22.02. Soon after the alleged aggravated assaults occurred, and prior to appellant being indicted for those alleged assaults, officials at the Bexar County Adult Detention Center imposed 15 days disciplinary detention upon appellant for his actions in those alleged aggravated assaults. At a pre-trial hearing, appellant argued that the imposition of the disciplinary detention and restriction from privileges barred the State from prosecuting him for the aggravated assaults.[2] Appellant based his argument upon both the Federal and State Constitutions. See U.S. CONST. amend. V & XIV, and TEX. CONST. art. I, § 14. The trial court overruled appellant's special pleas of double jeopardy and his applications for writ of habeas corpus seeking relief from double jeopardy. Appellant pursued an appeal of the trial court's decision. The Court of Appeals overruled both of appellant's points of error. *Hernandez v. State*, 904 S.W.2d 808 (Tex. App.—San Antonio 1995). Appellant sought review of this decision by this Court. We will affirm the judgment of the Court of Appeals.

## I. THE FACTS.

On September 9, 1991, while incarcerated in the Administrative Segregation Unit of the Bexar County Adult Detention Center, appellant and a fellow inmate, Edward Salazar, became involved in an altercation with two of their jailers, Roger Ybarra and Terry Payton. When Salazar allegedly assaulted Payton, appellant came up behind Ybarra and allegedly assaulted Ybarra. Two days later, on September 11, 1991[3], pursuant to a complaint by Officer Ybarra, appellant was

brought before an administrative hearing before the Administrative Hearing Board of the Detention Center for a violation of Rule 1–1 of the Bexar County Adult Detention Center Rules[4]. Appellant pled not guilty to the rules violation. The Board found that appellant "did assault officer Ybarra" and concluded that appellant was guilty of violating Rule 1–1. The Board assessed appellant fifteen days disciplinary detention. Within that disciplinary period of fifteen days, the Board imposed upon appellant restrictions from the commissary as well as from newspapers, visits, phones and programs.

Three years later, on November 3, 1994,[5] appellant appeared at the pre-trial hearing in the instant cases in which the trial court heard and ruled upon the issues in dispute before this Court. Appellant argued that he had already been punished by the ruling of the Administrative Hearing Board. He testified that for fifteen days he was cut off from communications with his family, that he had no way of knowing what was going on in the world outside, that he could not obtain late evening snacks from the commissary, and that he was cut off from participation in both the Detention Center's art program and continuing education. Appellant also presented evidence that he was locked-up in administrative segregation for 23 hours of the day and shackled whenever he was allowed out of his cell.

In rebuttal, the State attempted to show appellant suffered minimal additional sanctions as a result of the Administrative Hearing Board's decision. The State proved appellant was already confined in

---

1025–95 still alleges the offense of aggravated assault on a peace officer.

2. Appellant filed a pre-trial application for writ of habeas corpus seeking relief from double jeopardy in both cases. Appellant's motions in both cases were identical though they were presented under different cause numbers. He requested the trial court "hear and consider and rule on both of [those cases] at the same time", thereby combining his arguments in both cases at the pre-trial hearing and, later, on direct appeal. Appellant's petitions for discretionary review before this Court were also identical, albeit filed under their individual, respective cause numbers. We will treat them as one case for purposes of this review.

3. The custodian of the records of the Bexar County Adult Detention Center testified that the hearing was held on September 23, 1991. However, both of appellant's trial exhibits, Delta and Gamma, indicate the administrative hearing was actually held on September 11, 1991.

4. Rule 1–1 proscribes any act or attempt to commit any act against the policies and procedures and the rules of the Bexar County Adult Detention Center.

5. Appellant was indicted for these offenses during the January, 1992 term of the 144th Judicial District Court. He presented his pre-trial motions to the trial court in November of 1994.

the administrative segregation unit of the Detention Center when the alleged assault occurred on September 9th. At the time of his hearing, appellant and every other inmate in the administrative segregation unit were under 23 hour lock-up and were shackled when they left their cells. Even after being placed on disciplinary detention, appellant was not denied his one hour per day outside of his cell. Though cut off both from use of the phone and visits from the outside during the fifteen day detention, appellant was not cut off from contact with his attorney during that time. Appellant received his regular meals during the fifteen day detention, but could not order coffee, candy or cigarettes from the commissary. Except for chapel, appellant could not participate in the programs offered by the Detention Center to inmates confined in administrative segregation.

As mentioned above, appellant combined both cases in a single argument in the pretrial hearing. He asserted that his administrative hearing was similar to the assessment of controlled substances taxes in *Department of Revenue of Montana v. Kurth Ranch*, 511 U.S. 767, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994). Appellant argued that both were administrative actions which were punitive in nature and represented an attempt by the government to impose multiple punishments for the same criminal offense. Appellant offered *Kurth Ranch* as the basis for his arguments under both the federal and the state constitution. At the pre-trial hearing, he did not offer a separate basis for relief under the provisions of Art. I, § 14. The trial court overruled appellant's pre-trial motions. Appellant sought appeal from that decision.

## II. THE DECISION OF THE COURT OF APPEALS

On appeal, appellant argued that the Double Jeopardy Clauses of the Fourteenth Amendment of the U.S. Constitution and Article I, § 14 of the Texas Constitution barred the State from prosecuting him for aggravated assault of a jail guard because appellant had been previously punished for that assault

by officials of the Bexar County Adult Detention Center. In his brief before the court of appeals, appellant relied upon *Kurth Ranch* to argue under the Federal Constitution that the facts of his case warranted double jeopardy protection, whereas under the Texas Constitution appellant only argued in very general terms that Art. I, § 14 provided more protection than did its Federal counterpart. The San Antonio Court of Appeals overruled appellant's points of error. *Hernandez v. State*, 904 S.W.2d, at 813.

The Court of Appeals noted that Texas courts and their federal counterparts have consistently held that "disciplinary sanctions imposed by prison officials for crimes committed within the prison do not bar subsequent prosecution for those crimes in a court of competent jurisdiction." *Hernandez*, at 810; and cases cited therein. The San Antonio Court disagreed with appellant's argument that *Kurth Ranch* implicitly overruled these lines of cases. They believed *Kurth Ranch* modified *Halper's* [6] double jeopardy analysis "only insofar as tax statutes are concerned" and that the Court did not contemplate *Kurth Ranch*'s application to prison disciplinary sanctions or other civil or administrative actions. The San Antonio Court agreed with a statement made by the U.S. District Court for the Eastern District of Wisconsin that

"This Court cannot depart from a rule uniformly established by federal and state courts simply because dicta contained in a Supreme Court opinion, dealing with facts and issues wholly unrelated to the present dispute, could be read to require a different result."

*Garrity v. Fiedler*, 850 F.Supp. 777, at 779 (E.D.Wis.1994). The San Antonio Court then applied *Halper's* test to determine if the disciplinary sanctions served only as a "deterrent or retribution" without any remedial elements. *Hernandez v. State*, 904 S.W.2d, at 811.

The San Antonio Court of Appeals concluded the State has a "sound remedial interest 'to encourage good conduct and to maintain order in the prison'." They were not deterred from this conclusion by the fact that

6. *United States v. Halper*, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989).

"these remedial concerns require 'punishing' individuals for violent and disruptive behavior." *Hernandez v. State,* 904 S.W.2d, at 812; and cases cited therein. The San Antonio Court explained they would not determine if a sanction constituted punishment from "the defendant's perspective, since 'even remedial sanctions carry the sting of punishment'." *Hernandez v. State,* supra; citing *United States v. Halper,* 490 U.S., at 447, 109 S.Ct., at 1901. Applying *Halper,* the San Antonio Court found the disciplinary sanctions imposed upon appellant did not constitute punishment because they were not grossly disproportionate to the remedial goals of maintaining order and discipline in the prison system. In addition, the San Antonio Court believed that the inherent necessity to withdraw or limit many privileges or rights of prisoners in the interest of properly administering a prison in order to maintain institutional security is a tradition that the Supreme Court did not intend to alter with its decisions in *Halper* and *Kurth Ranch.* *Hernandez v. State,* 904 S.W.2d, at 812–813.

The San Antonio Court also rejected appellant's state constitutional argument. They noted that Art.I, § 14 generally afforded the same protection as did the Fifth Amendment. They also stated that even after *Heitman v. State,* 815 S.W.2d 681 (Tex. Cr.App.1991), many of the state's courts of appeals still found the State was not barred by Art. I, § 14 from trying an inmate when he has already been punished for the same conduct in a prison disciplinary proceeding. The Court of Appeals then concluded the Texas Constitution did not protect appellant from being tried for aggravated assault after he had already been subjected to a 15–day disciplinary detention. *Hernandez v. State,* 904 S.W.2d, at 813. Appellant sought review from this Court.

### III. THIS COURT'S DECISION.

#### A. The Fifth Amendment.

■ In his petition, appellant urges this court to reverse the decision of the San Antonio Court of Appeals that, under the Fifth Amendment, the disciplinary sanctions did not bar appellant's prosecution for aggravated assault. Appellant argues the San Antonio Court failed in its attempt to distinguish *Kurth Ranch* from the dispute in the instant case. Instead, appellant argues the holding in *Kurth Ranch* is not limited to just tax cases, even though the Court focused on deciding whether the Montana drug tax was punitive. When the Court in *Kurth Ranch* found the imposition of the drug tax to be punitive, it then concluded that jeopardy barred its imposition against the defendants. Appellant asserts that the methodology evident in this decision in *Kurth Ranch* is to simply determine whether there has been an imposition of multiple punishments, and that this methodology has a more general applicability than just to cases involving the imposition of drug taxes.

In his petition, appellant argues the facts of his case support the conclusion that the disciplinary sanctions were punishment for the assault he allegedly committed, thereby barring any further prosecution for that conduct under the ruling in *Kurth Ranch.* As support, appellant discusses the trial-like atmosphere and procedures of the administrative hearing at the detention center, the fact that the administrative board found appellant guilty and imposed fifteen days disciplinary detention upon appellant, and his allegation that the witness Robinson admitted appellant's "punishment"[7] was assessed at fifteen days.

In his brief, appellant emphasizes the punitive aspects of his disciplinary detention. He could not buy newspapers, could not use the phone (except to call his attorney), could not order from the commissary, could not receive visits (except from his attorney), could not attend all of the programs offered by the detention center (such as the art program or the GED program, but not including chapel),

---

7. The witness was Captain William Robinson, custodian of the records of the Bexar County Adult Detention Center. Robinson actually testified that appellant was "assessed fifteen days of disciplinary detention and restriction from all privileges." Appellant's counsel immediately asked Robinson, "So, the punishment was assessed at fifteen days?" Robinson replied, "Yes." Captain Robinson did not characterize appellant's sentence as punishment, though he did passively assent to appellant's characterization of it as punishment.

and he was locked down for twenty-three hours per day (when he was let out for one hour, he was shackled). Appellant concludes by paraphrasing *Kurth Ranch:* a criminal prosecution is not the kind of sanction that may follow the first punishment that appellant was assessed for assaulting the officers. Since the administrative sanction imposed upon him "was plainly and undoubtedly intended to be punishment by those who imposed it," appellant argues, "no additional punishment is permitted."

Appellant also claims support for this conclusion from *United States v. Halper.* Appellant relies on *Halper* for the proposition that where a sanction cannot be described as solely remedial, then it constitutes punishment. Relying upon these two cases, the premise of appellant's argument is that the disciplinary sanctions imposed upon him had punitive aspects and, as a result, they bar any further attempt to punish him for the aggravated assaults. Appellant cites no cases which directly supports his argument that jail disciplinary sanctions are inherently punitive, or that they erect a jeopardy bar to subsequent criminal prosecution.

This Court believes the disciplinary sanctions imposed upon appellant by the Administrative Hearing Board at the Bexar County Adult Detention Center did not constitute punishment under the Fifth Amendment. Appellant's fifteen day disciplinary detention does not bar the State from subsequently prosecuting appellant for aggravated assault. We begin by noting that neither *Kurth Ranch,* nor *Halper,* support appellant's argument.

Contrary to appellant's argument, this Court concludes that *Kurth Ranch* is distinguishable from appellant's case. As explained above, appellant views *Kurth Ranch* as supporting a simple inquiry simply into whether a civil sanction was administered punitively; in other words, whether the effects of the sanction were punitive. From this, appellant asserts that we can presume

the sanctioning party intended to punish the subject of the civil sanction. We believe appellant has mistaken the nature of the Supreme Court's inquiry in *Kurth Ranch.*

The Court did not merely look at the effects which resulted from imposition of the drug tax, but looked to the structure of the drug tax itself to determine whether the tax was motivated by a "penal and prohibitory intent." *Kurth Ranch,* at 781, 114 S.Ct., at 1947; see also, *U.S. v. Ursery,* —— U.S. ——, at ——, 116 S.Ct. 2135, at 2144, 135 L.Ed.2d 549 (1996). In *Ursery,* the Court reviewed the factors which they relied upon in *Kurth Ranch* to decide if Montana created its drug tax with a penal and prohibitory intent.

"Several differences between the marihuana tax imposed by Montana and the typical revenue-raising tax were readily apparent. The Montana tax was unique in that it was conditioned on the commission of a crime and was imposed only after the taxpayer had been arrested: thus, only a person charged with criminal offense was subject to the tax. We also noted that the taxpayer did not own or possess the taxed marihuana at the time the tax was imposed. From these differences, we determined that the tax was motivated by a "'penal and prohibitory intent rather than the gathering of revenue.'" *Id.,* at 781, 114 S.Ct., at 1947."

*Ursery,* at ——, 116 S.Ct., at 2144. Indeed, when this Court handed down *Stennett v. State,* 941 S.W.2d 914 (Tex.Cr.App.1996), we made the same inquiry into our own Controlled Substances Tax in order to determine if it had also been created with a penal and prohibitory intent.

Even though this Court noted some important differences between the Montana drug tax and the Texas controlled substances tax [8], this Court concluded that the "plain and undoubted" intent of the Texas Legislature was for the Texas controlled substances tax to be considered punishment. *Stennett,* 941

---

8. This Court noted that unlike Montana, in Texas the subject of the controlled substances tax is not obligated to pay the tax only upon being arrested and charged with commission of a drug crime. Instead, in Texas, the obligation to pay the tax arises upon the occurrence of the taxable event

itself, regardless of whether the taxable event has come to the attention of law enforcement officers yet. Also, the Texas tax provided a means for the subject of the tax to pay the tax in confidence, thereby theoretically avoiding detection, arrest and prosecution. *Stennett,* 941 S.W.2d, at 916.

S.W.2d, at 916. This Court set out several "typical" public and official comments by the sponsors and proponents of the tax bill and then concluded they were "satisfactory evidence that the legislature intended the tax on marihuana and other controlled substances to serve as further punishment for criminal conduct already punishable by heavy fines and protracted incarceration under the Texas Penal Code." *Stennett,* 941 S.W.2d, at 917. For that reason, this Court came to the same conclusion about the Texas drug tax in *Stennett* as the Court did about the Montana drug tax in *Kurth Ranch*—that they were created with a penal intent and were therefore punishment. In contrast, appellant mistakenly characterized *Kurth Ranch* as a mere inquiry into determining whether the drug tax had punitive effects.

Appellant was also mistaken about *Halper,* which he cited for the proposition that any sanction which cannot be characterized as purely remedial must therefore be punitive. In *Halper,* the defendant was convicted of 65 counts of violating the Federal false claims statute in connection with a Medicare fraud scheme. Following the defendant's criminal conviction, the government sought to assess civil penalties against him under provisions which provided for fines in the amount of $2000 per violation, double the Government's actual damages, and court costs. The Court conceded there was no absolute rule that a civil fine could never be punishment under the Fifth Amendment. The Court also explained that a civil remedy is not automatically considered punishment just because the amount of the civil penalty exceeds the government's actual damages. Between these two extremes, the Court decided that they could not "foreclose the possibility that in a particular case a civil penalty ... may be so extreme and so divorced from the Government's damages and expenses as to constitute punishment." *United States v. Halper,* 490 U.S., at 442, 109 S.Ct., at 1898. To resolve whether the civil fines were punishment, the Court emphasized that it was engaging in a case-specific inquiry of whether the civil penalty imposed upon the defendant was so disproportionate to the damages suffered by the government that it constituted punishment for purposes of the Fifth Amend-

ment. *Halper,* 490 U.S., at 452, 109 S.Ct., at 1903–1904.

Appellant's argument that *Halper* should lead us to conclude that a sanction is punishment if it cannot be said to be solely remedial is belied by the fact that the Court in *Halper* conceded that a civil fine could exceed the government's damages and still be remedial. *Halper,* 490 U.S., at 452, 109 S.Ct., at 1903–1904; see, also *U.S. v. Ursery,* —— U.S. ——, at ——, 116 S.Ct. 2135, at 2143, 135 L.Ed.2d 549 (1996). The lesson of *Halper* is not that a civil fine can only be considered to be remedial when it has no punitive aspect whatsoever.

Instead, the lesson of *Halper* is that each civil sanction should be viewed individually to determine if it is so grossly disproportionate to the government's actual damages, which the sanction was designed to offset, that it can be found to be punitive. The presumption behind this formula is that a civil fine is never purely remedial or purely punitive, but always a combination thereof that necessitates the case-by-case inquiry where the remedial aspects are weighed against the punitive in order to determine if the civil fine is remedial or not.

■ From what we have seen in *Kurth Ranch, Stennett, Halper* and *Ursery,* this Court should look to whether the disciplinary sanctions were created with an intent to be punitive (*and not, as appellant would have it,* whether they were imposed in a punitive manner) or were they created with an intent to achieve a remedial goal. If the latter is true, then this Court should determine whether the disciplinary sanctions imposed upon appellant were so disproportionately punitive that they superceded the remedial goal of those sanctions.

First, the disciplinary sanctions were not intended solely to be punishment. On the contrary, the disciplinary sanctions were meant to serve a remedial goal. They were intended to serve the detention center's goals of maintaining order and discipline within the jail population in order to ensure a safe environment. As mentioned above, Captain William Robinson, custodian of the disciplinary records of the Bexar County Adult De-

tention Center, testified at the pre-trial hearing. At one point, Robinson testified about the "administrative purpose for administrative discipline within the facility." Robinson explained that the disciplinary sanctions were meant "to maintain discipline within the detention center" and "to deter other people from committing misconduct over there." By deterring misconduct, a detention center can maintain an environment which is safe both for the inmates and the employees of the detention center. Appellant introduced no evidence to refute Robinson's testimony that the Bexar County Adult Detention Center's disciplinary sanctions served remedial goals.

Though they are not controlling authority in the instant case, the statutes which established and maintain the Texas Department of Corrections, Institutional Division, support the conclusion that institutional disciplinary sanctions are meant to ensure an orderly and safe environment within a prison or detention center. TEX. GOV'T CODE ANN. § 499.102(a) directs the staff of the Institutional Division to make determinations and recommendations to increase the capacity of the division so long as the division still provides for

" (9) a fair disciplinary system that ensures due process and is adequate to ensure safety and order in the unit."

§ 494.002(a) specifies the duties of the Director of Institutional Division. Within those duties is the responsibility of the Director to establish policies which govern the "discipline of inmates and may arrange for the separation and classification of inmates according to the inmates' ... corrigibility."

These statutes also provide for the management of discipline within community corrections facilities. § 509.006(b)(3) sets out that the Institutional Division "may require that community corrections facilities develop standards for ... disciplinary rules for residents of community corrections facilities." These statutes indicate the disciplinary rules for inmates of the Institutional Division intend to serve the goals of safety and order within the prison units, which corresponds to Captain Robinson's testimony regarding the goals which the Bexar County Adult Detention Center's disciplinary sanctions are meant to achieve.

■ Conceding that the decisions of appellate courts of other states are advisory, and not controlling, this Court observes that courts in other jurisdictions, when confronted with the burden of deciding whether prison disciplinary sanctions were intended to be punitive or remedial, have concluded these sanctions are remedial provisions which "are necessary to the safe, orderly and effective functioning of prisons." *People v. Vasquez*, 89 N.Y.2d 521, at 532, 655 N.Y.S.2d 870, 678 N.E.2d 482 (1997). See, also, *State v. Santiago*, 240 Conn. 97, 689 A.2d 1108, at 1110 (1997) ("administrative sanctions, like those meted out to the defendant in this case, serve the purpose of maintaining institutional order and security and do not give rise to double jeopardy clause violations."); *State v. Blick*, 481 S.E.2d 452, at 455 (S.C.App.1997) ("The purpose of a prison disciplinary proceeding is to maintain institutional order rather than to prosecute criminal conduct. The adoption and execution of policies and practices necessary to preserve internal order and discipline, and to maintain institutional security in the prison are within the province and expertise of correctional officials."); *People v. Baptist*, 284 Ill.App.3d 382, 219 Ill.Dec. 890, at 892, 672 N.E.2d 398, at 400 (4 Dist.1996), cert. denied, 172 Ill.2d 555, 223 Ill.Dec. 197, 679 N.E.2d 382, ("The government possesses the important remedial interest of maintaining order and encouraging compliance with prison rules where good order and discipline are paramount because of the concentration of convicted criminals."); *State v. Harlin*, 260 Kan. 881, 925 P.2d 1149, at 1156 (1996)("Disciplinary rules and procedures are necessary for the control of dangerous and desperate individuals unwillingly confined in such institutions, in order to protect employees, inmates, and visitors, as well as the physical structure itself."); *State v. Beck*, 545 N.W.2d 811, at 815 (S.D.1996)("Prison discipline allows correction authorities to achieve a valid remedial goal—the maintenance of prison security and order."); *State v. McKenzie*, 542 N.W.2d 616, at 620 (Minn.1996)( "[the establishment of] institutional order and [to] protect prison staff and fellow inmates from

violent or uncooperative prisoners" ... "are remedial goals, intended to prevent further disruption of prison security."); *People v. Watson*, 892 P.2d 388, at 390 (Colo.App. 1994)("[t]he purpose of a prison disciplinary proceeding is not primarily to punish, but to determine whether prison rules are broken and to maintain institutional order."); and *State v. Lynch*, 248 Neb. 234, 533 N.W.2d 905, at 910 (1995)( The Court adopted the statements of the Third Court of Appeals in *U.S. v. Newby*, infra, to support its conclusion that prison disciplinary sanctions are remedial in nature.).

Appellate courts within the federal system have also reached the conclusion that prison disciplinary sanctions are intended to serve the remedial goal of maintaining discipline and ensuring order and safety within the confines of a prison system. In *U.S. v. Newby*, 11 F.3d 1143, at 1145 (3rd Cir.1993), cert. denied, 513 U.S. 834, 115 S.Ct. 111, 130 L.Ed.2d 58 (1994), the Court of Appeals found that "the prison disciplinary proceeding is one to determine whether prison rules are broken and to maintain institutional order. ... [The government's remedial goal is] to encourage good conduct and to maintain order in the prison, given that prison is a place where good order and discipline are paramount because of the concentration of convicted criminals. ... The authorities' ability to revoke [good time credits] is designed to encourage the inmates to continue their good conduct and, thus, is rationally related to the remedial goal." In *U.S. v. Hernandez–Fundora*, 58 F.3d 802, at 807 (2nd Cir. 1995), cert. denied, 515 U.S. 1127, 115 S.Ct. 2288, 132 L.Ed.2d 290 (1995), the Court of Appeals adopted the *Newby* Court's statement of the remedial goals of prison disciplinary proceedings and sanctions. In *U.S. v. Brown*, 59 F.3d 102, at 105 (9th Cir.1995), the Court of Appeals concluded that the disciplinary sanctions imposed upon the defendant (withholding of good time credit and disciplinary transfer) "serve the remedial goals of maintaining institutional order and encouraging compliance with prison rules." The Court of Appeals noted the defendant's argument that the sanctions were directed at deterring him from repeating the same conduct. However, the Court of Appeals found

"in the prison context, such sanctions can still be explained solely as serving the government's remedial purpose of maintaining institutional order—they are designed to punish only insofar as such sanctions enable the government to fulfill its remedial goals." *U.S. v. Brown*, ibid.

This Court concludes the disciplinary sanctions imposed upon appellant by the Administrative Hearing Board of the Bexar County Adult Detention Center served the remedial goals of maintaining order and discipline within the jail population in order to ensure a safe environment for inmates, prison staff and correctional officers. As the *Brown* Court explained, the fact that the sanctions were directed at deterring appellant from any further attacks upon correctional officers does not detract from this conclusion.

Having established the remedial goals of the disciplinary sanctions in the instant case, this Court turns to the determination of whether the sanctions imposed upon appellant were disproportionate to those remedial goals. First, this Court notes that other jurisdictions have employed and continue to employ a similar balancing test when attempting to determine whether a disciplinary sanction was punitive or remedial. Though they are not controlling authority in this case, this Court can look to them as advisory.

In *People v. Vasquez*, 89 N.Y.2d 521, 655 N.Y.S.2d 870, 678 N.E.2d 482, the defendant argued that the disciplinary sanctions imposed upon him at the Elmira Correctional Facility created a jeopardy bar to his subsequent prosecution. Prison guards found the defendant to be in possession of a "shank" and he was subsequently brought before a Superintendent's hearing. The Hearing Officer imposed a penalty of 180 days in the Special Housing Unit and six months loss of privileges and good time. A disciplinary review committee later modified the penalty to 145 days in the Special Housing Unit. One month later, the defendant was indicted for the promotion of prison contraband, a Class D felony in New York. The defendant attempted to dismiss the charges on double jeopardy grounds. The trial court denied the motion and the defendant was ultimately

convicted and assessed an indeterminate consecutive term of three to six years. *Vasquez*, at 525, 655 N.Y.S.2d 870, 678 N.E.2d 482. On appeal, the New York Court of Appeals rejected the defendant's jeopardy claim.

The New York Court of Appeals concluded that

"the Double Jeopardy Clause does not bar criminal prosecution of a prison inmate simply because the inmate was previously subjected to internal prison disciplinary action for the same conduct."

*Vasquez*, at 529, 655 N.Y.S.2d 870, 678 N.E.2d 482. The Court of Appeals found that prison disciplinary action was not designed to vindicate public justice, but instead to further "the public interest in maintaining prison order and safety." Just because the Court of Appeals recognized that prison disciplinary sanctions, in some sense, constituted a form of punishment, they were not inexorably led to the conclusion that sanctions constituted " 'punishment' within the meaning of double jeopardy jurisprudence." *Vasquez*, supra.

The Court of Appeals resolved the conflict between the punitive goal of vindicating public justice and the remedial goal of maintaining prison order and safety by acknowledging that a prisoner is subject both to criminal laws, which are aimed at vindicating societal interests, and internal prison orders and regulations, which are aimed at serving the institutional goals of preserving prison order and safety.

"A prisoner who commits a crime in prison breaks both sets of rules, and may thus be sanctioned both internally to carry out the goals of the penal institution, and through criminal prosecution to vindicate public justice, so long as the disciplinary sanction does not stray so far beyond the bounds of the separate State interest in maintaining prison order and safety that the sanction can only be viewed as constituting criminal punishment."

*Vasquez*, 89 N.Y.2d, at 529, 655 N.Y.S.2d 870, 678 N.E.2d 482. Because it believed it would be virtually impossible to quantify the remedial purposes served by prison disciplinary sanctions, thereby rendering it nearly impossible to apply the balancing test of *United States v. Halper*, the New York Court of Appeals turned to *United States v. Ursery* for guidance in determining whether the prison disciplinary sanctions imposed upon the defendant constituted punishment.

Having determined that the prison disciplinary sanctions were not intended to constitute criminal punishment, the Court of Appeals relied upon the Supreme Court's decision in *Ursery* and directed their inquiry toward determining whether the sanctions were "so grossly unrelated" to the government's remedial interests "at stake in a prison environment that they [could] only be viewed as criminal punishment." *Vasquez*, at 531–532, 655 N.Y.S.2d 870, 678 N.E.2d 482. After pointing out the remedial interests behind prison disciplinary sanctions of maintaining prison safety for both inmates and correctional officers, as well as preserving discipline and order within the prison population, the Court of Appeals examined whether the sanctions imposed punished the defendant. The Court of Appeals conceded the sanctions had a deterrent effect, but believed that deterrent effect was "aimed exclusively at deterring conduct within the prison setting." The Court of Appeals explained that "neither loss of good-time credits and other special privileges nor placement in a Special Housing Unit extend[ed] the period of incarceration originally imposed. The sanctions [were] aimed exclusively at the terms and conditions of the sentence being served by the [defendant]." Therefore, the New York Court of Appeals held "that the disciplinary sanctions imposed upon [the defendant did] not constitute criminal punishment triggering double jeopardy protections." *Vasquez*, at 532–533, 655 N.Y.S.2d 870, 678 N.E.2d 482. The Court of Appeals presumed without deciding that in "rare circumstances, a prison disciplinary [sanction] might be so harsh and extreme as to invoke double jeopardy protections," but explained that was not the case in *Vasquez*.

See, also, *State v. Santiago*, 689 A.2d, at 1110–1111 (Wherein, prison officials imposed sanctions of 10 days' punitive segregation, 30 days' loss of phone and mail privileges, and loss of 45 days of good time credits. The Court found "nothing so harsh about the

administrative sanctions imposed against the defendant that would cause [them] to conclude they were disproportionate to the state's legitimate interest in maintaining prison order and discipline. The sanctions imposed on the defendant were rationally related to the legitimate remedial purpose of allowing the prison officials to maintain order and discipline."); *People v. Baptist,* 219 Ill.Dec., at 893, 672 N.E.2d, at 401 (wherein, the defendant's good time credits were reduced by one year and he was sentenced to two years' "grade C segregation". The Court concluded the disciplinary sanctions "do not constitute punishment so long as they are not grossly disproportionate to the remedial goals of maintaining order and discipline." The Court found the sanctions imposed on the defendant were not punitive.); *State v. Harlin,* 925 P.2d, at 1156 (wherein, the defendant was sentenced to 82 days' segregation, 111 days' restriction of privileges, and fined $50. The Court concluded "the regulations which govern prison disciplinary procedures herein and the actual discipline imposed clearly do not constitute a basis for the application of *Halper* and a determination that the prison discipline imposed rises to the level of punishment or multiple prosecution for double jeopardy purposes."); *State v. Beck,* 545 N.W.2d 811, at 817 (wherein, the defendant was sanctioned to receive 93 days in punitive segregation[9], 90 days loss of good time, a transfer to a higher security facility, and loss of eligibility for trustee status. The Court found these sanctions served the remedial goal of maintaining prison order and discipline because they were not grossly disproportionate to those interests.); *State v. McKenzie,* 542 N.W.2d 616, at 621 (wherein, the defendant was sanctioned to receive 300 days in segregation and no receipt of good time credit for the time spent in segregation. The Court concluded "[the

defendant's] case, however, is not representative of the 'rare case' where the discipline imposed upon an inmate 'is overwhelmingly disproportionate to the damages he has caused'."); *People v. Watson,* 892 P.2d 388, at 390 ("[T]he specific discipline imposed here—loss of good time credit, transfer, and segregation—was not so grossly disproportionate to the remedial goal of maintaining prison order and discipline so as to render the sanction 'punishment' for double jeopardy purposes."); and *People v. Frazier,* 895 P.2d 1077, at 1079 (Colo.App.1994)(The Court of Appeals relied upon *People v. Watson* to conclude the Double Jeopardy Clause was not violated by the prosecution of the defendant subsequent to his receipt of sanctions by prison officials.).

Appellate courts within the federal system also made the same effort to determine whether the disciplinary sanctions imposed upon a prisoner were so grossly disproportionate to the remedial goals of those sanctions as to constitute punishment for double jeopardy purposes. In *U.S. v. Newby,* 11 F.3d, at 1145, wherein the defendant lost 1000 days of good time credit, the Court of Appeals concluded the facts of the case demonstrated the prison disciplinary sanctions imposed upon the defendant were not "so grossly unrelated to prison authorities' remedial goals as to constitute a "punishment" within the meaning of the Double Jeopardy Clause." In *U.S. v. Hernandez–Fundora,* 58 F.3d, at 807, the Court of Appeals concluded that "subsequent prosecutions will be barred only in those exceedingly rare circumstances where the disciplinary sanction imposed is grossly disproportionate to the government's interest in maintaining prison order and discipline." The defendant's sanction of 45 days' administrative segregation was found to be "sufficiently related to the government's remedial interest that it did not con-

---

9. The Court in *Beck* took note of the fact that the sanction which placed the defendant in segregation was labeled "punitive." The "mere fact that a sanction imposed by prison officials has a punitive component does not mean that the sanction constitutes 'punishment' for double jeopardy purposes." *State v. Beck,* at 816. See, also, *McKenzie,* wherein the Court concluded, "the labels chosen by the Department of Corrections are not determinative of the character of the

sanctions because the Supreme Court requires a case-by-case assessment of the nature of the penalty imposed and its intended purpose." *State v. McKenzie,* at 620.

This reasoning applies to Captain Robinson's use of the phrase "punishment" during his testimony on appellant's sanctions. Though he labelled these sanctions "punishment", this did not mean the sanctions met the legal definition for punishment under the Fifth Amendment.

stitute punishment for double jeopardy purposes." In *U.S. v. Brown,* 59 F.3d, at 105–106, the Court of Appeals found the prison authorities' decision to withhold 41 days of good time credits and transfer the defendant to a more secure institution was not so disproportionate to the prison's remedial goal of maintaining prison order as to be punitive. "This is not a 'rare' case in which a remedial sanction was so harsh as to constitute punishment." Relying upon the above cited cases, the Court of Appeals in *U.S. v. Galan,* 82 F.3d 639, at 640 (5th Cir.1996), concluded that the defendant's being held in segregation, being transferred to a higher security institution and losing good time credit did not raise a jeopardy bar to criminal prosecution.

In the instant case, the sanctions imposed upon appellant by the Administrative Hearing Board at the Bexar County Adult Detention Center were not so grossly unrelated to the County's remedial interests at stake in the environment of the Detention Center that they could only be viewed as criminal punishment. This Court notes appellant was already confined in administrative segregation when he was brought before the Administrative Hearing Board. Their additional assessment of fifteen days disciplinary detention was not disproportionate to the Bexar County Adult Detention Center's remedial goals of maintaining order and discipline. This Court concludes appellant's Fifth Amendment double jeopardy protections were not violated by the sanctions imposed upon him.

To rule otherwise in this case would place prison and jail staffs in the position of having to choose between immediate disciplinary sanctions and pursuing criminal prosecutions. This could very well have a destructive effect upon the ability of the staffs of the State's jails and prisons to maintain discipline within their respective inmate populations. The Third Circuit Court of Appeals explained the nature of the potential dilemma for prison and jail authorities:

"Were we to accept the defendants' argument, we would hamper the ability of the prison authorities to administer the prisons. If a prison disciplinary sanction bars subsequent criminal prosecution, the prison authorities will be forced to choose between instituting a disciplinary proceeding or awaiting a criminal prosecution. The process of conducting a criminal investigation and prosecution may take a considerable time. The difficulties and delay that a criminal prosecution entails would leave the prisoners who violated the prison rules without a prompt resolution of charges and hinder prison administration and discipline."

*U.S. v. Newby,* 11 F.3d, at 1146. See, also, *Meeks v. McBride,* 81 F.3d 717, at 722 (7th Cir.1996); and *People v. Baptist,* 284 Ill. App.3d 382, 219 Ill.Dec. 890, at 892, 672 N.E.2d 398, at 400. Appellant's first ground for review is overruled.

### B. Article I, § 14.

■ In its opinion, the San Antonio Court of Appeals made the general statement that Article I, § 14 of the Texas Constitution afforded the same protections as the Fifth Amendment. *Hernandez,* 904 S.W.2d, at 813. However, in *Bauder v. State,* 921 S.W.2d 696 (Tex.Cr.App.1996), this Court concluded that the Supreme Court's interpretations of the Fifth Amendment do not "govern the meaning of the Texas Constitution," and are not "authoritative" for this Court's interpretations of Art. I, § 14. *Bauder v. State,* 921 S.W.2d, at 697. This Court then proceeded to examine whether Art.I, § 14 protected defendants from being retried after declarations of mistrial provoked by the prosecution. In answering this question, this Court only looked to opinions of the Supreme Court "insofar as they reveal the thinking of intelligent jurists on questions of common interest." *Ibid.* Pursuant to this Court's opinion in *Bauder,* we conclude the San Antonio Court of Appeals erred when it stated that Art.I, § 14 and the Fifth Amendment generally afford the same protections.

In this case, this Court does not reach the issue of whether Art. I, § 14 affords greater protection to appellant than does the Fifth Amendment. Appellant failed to present to this Court sufficient or adequate argument or authorities that Art. I, § 14 extends greater jeopardy protection to him. In his peti-

tion, appellant argued the San Antonio Court erred when it concluded that art. I, § 14 and the Fifth Amendment extended the same protections against double jeopardy. But his argument in his petition went no further than his statement that,

> "This court has not yet decided whether the state constitution provides greater protection than the federal constitution regarding the prohibition against multiple punishments. Appellant's case presents just that issue, and is therefore an appropriate vehicle for deciding this important issue of state constitutional law."

In his brief to this Court, appellant did not provide any more argument or authority to support his position. After noting this Court's decision in *Bauder*, appellant made only these remarks:

> "Even if administrative sanction is not "punishment" under the Federal Double Jeopardy Clause, it is under Art. I, § 14 of the Texas Constitution. Accordingly, whatever the outcome of our federal constitutional claim, the indictments alleging that appellant committed aggravated assault must still be dismissed under the Texas Constitution."

These are merely bare assertions unsupported by argument, analysis, or authority.[10] Therefore, this Court shall not consider appellant's state constitutional argument. *Robinson v. State*, 851 S.W.2d 216, at 222 (Tex. Cr.App.1991); and TEX.R.APP.PROC. Rules 74(f) and 203. We overrule appellant's second ground for review.

Appellant's petitions for discretionary review are overruled. The decision of the Court of Appeals is affirmed.

OVERSTREET, J., concurs with result.

KELLER, Judge, concurring.

The Court of Appeals opinion states that Art. I, Sec. 14, of the Texas Constitution and the Fifth Amendment to the United States Constitution generally afford the same protections. On this basis, and after further analysis, the Fourth Court overruled appel-

lant's state constitutional claim. This Court concludes that the Court of Appeals erred in finding the constitutional provisions to be comparable. Then, finding that appellant failed to brief the state constitutional claim adequately, the majority refuses to consider it.

I agree with the Court of Appeals regarding the similarity of the two constitutional provisions. As the Court of Appeals noted, this Court has said that, conceptually, the State and Federal double jeopardy provisions are identical. *Stephens v. State*, 806 S.W.2d 812, 815 (Tex.Crim.App.1990), *cert. denied*, 502 U.S. 929, 112 S.Ct. 350, 116 L.Ed.2d 289 (1991) (citing *Phillips v. State*, 787 S.W.2d 391, at 393 n. 2 (Tex.Crim.App.1990)).

Furthermore, I would address appellant's claim under the Texas Constitution and hold, as the Court of Appeals did, that "the Texas Constitution does not preclude the State from trying an inmate even though he has been the subject of disciplinary proceedings in prison for the same conduct." Because the majority does not, I concur in the disposition of appellant's second ground for review.

McCORMICK, P.J., joins this opinion.

---

10. Appellant also failed to support his claim under Art. I, § 14 before both the trial court and