ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of - | ) |
| | ) |
| Triple Canopy, Inc. | ) ASBCA Nos. 61415, 61416, 61417 |
| | )              61418 61419, 61420 |
| | ) |
| Under Contract No. H92237-10-C-0593 *et al.* | ) |
| | ) |

APPEARANCES FOR THE APPELLANT:      Armani Vadiee, Esq.
                                       Todd M. Garland, Esq.
                                         Smith Pachter McWhorter PLC
                                       Tysons Corner, VA

APPEARANCES FOR THE GOVERNMENT:     Caryl A. Potter, III, Esq.
                                         Air Force Deputy Chief Trial Attorney
                                       Michael J. Farr, Esq.
                                       Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE WOODROW

Triple Canopy Inc. (Triple Canopy) appeals the contracting officer's (CO) deemed denial of six certified claims, totaling $382,843.24, derived by fees imposed by the Government of the Islamic Republic of Afghanistan (GIRA) on private security companies (PSC) operating in Afghanistan with more than 500 employees. On May 7, 2020, the Board issued a decision denying the appeals based upon a finding that Triple Canopy's claims were time-barred.[1] *Triple Canopy, Inc.*, ASBCA Nos. 61415, 61416, 61417, 61418, 61419, 61420, 20-1 BCA ¶ 37,675. The United States Court of Appeals for the Federal Circuit (Federal Circuit) has reversed and remanded that decision on the ground that Triple Canopy's claim submission to the CO was within the six-year CDA limitations period. *Triple Canopy, Inc. v. Sec'y of Air Force*, 14 F.4th 1332, 1342 (Fed. Cir. 2021). In addition, the Federal Circuit noted that:

> [T]he government urges us to hold that Triple Canopy did
> not establish that GIRA's assessment constituted a "tax"
> for purposes of the Foreign Tax Clause, which the
> government argues is the prerequisite for an adjustment
> under FAR 52.229-6(d). The contractor argues that the
> Foreign Tax Clause embraces more than "taxes." . . . . As

---

[1] The Board assumes familiarity with its May 7, 2020 decision. We restate the facts only to the extent necessary in this opinion.

> Triple Canopy notes . . . the Board made no findings on the scope of the clause or the factual question regarding the nature of the GIRA assessment. This question of fact is not for us to decide in the first instance on appeal. We therefore do not address it. It is for the Board to consider on remand.

*Id*. at 1342 n.7.

For the reasons set forth below, we conclude that (1) the government breached each contract at issue by failing to compensate Triple Canopy for the fees imposed by the GIRA, and (2) Triple Canopy is entitled to an equitable price adjustment for the GIRA's assessment of fees. We sustain the appeals.

<u>FINDINGS OF FACT</u>

1. In February 2008, the GIRA issued a directive entitled "Procedure for Regulating Activities of Private Security Companies in Afghanistan" (PSC Regulation) (R4, tab 33 at 17-71).

2. Article 7 of the PSC Regulation required all PSCs to observe Afghanistan law, including the PSC Regulation. Specifically, Article 7 stated "[a] Security Company is obliged to observe the provisions of the valid laws of the country and this procedure[.]" (R4, tab 33 at 22)

3. Article 10 of the PSC Regulation provided: "The number of staff of each Security Company shall not be more [than] 500 people, unless the Council of Ministers agrees [to] an increased number of staff" (R4, tab 33 at 23).

4. Although the PSC Regulation limited the number of PSC personnel to 500, the regulation did not provide for the imposition of fees or penalties on PSCs operating in Afghanistan that exceeded the limit (*see generally* R4, tab 33).

5. Triple Canopy, Inc. is a licensed private security company in Afghanistan (R4, tab 26 at 6). Triple Canopy provided private security services to military bases in Afghanistan in accordance with six fixed-priced contracts that were awarded between March 15, 2009 and September 10, 2010 (R4, tabs 1-2, 27, 34, 39, 45, 51). The contracts were awarded by the Department of Defense, and many of them were issued through the Combined Joint Special Operations Task Force-Afghanistan (CJSOTF-A or government) (*id*.). Each contract required Triple Canopy to comply with local law (R4, tabs 1 at 11, 27 at 9, 34 at 9, 39 at 8, 45 at 8, 51 at 8).

2

6.  In addition, each contract incorporated by reference Federal Acquisition Regulation (FAR) 52.229-6, TAXES--FOREIGN FIXED PRICE CONTRACTS (June 2003) (R4, tabs l at 7, 27 at 9, 34 at 9, 39 at 8, 45 at 7, 51 at 7).  FAR 52.229-6 provides, in relevant part:

> The contract price shall be increased by the amount of any after-imposed tax or of any tax or duty specifically excluded from the contract price by a provision of this contract that the Contractor is required to pay or bear, including any interest or penalty, if the Contractor states in writing that the contract price does not include any contingency for such tax and if liability for such tax, interest, or penalty was not incurred through the Contractor's fault, negligence, or failure to follow instructions of the Contracting Officer or to comply with the provisions of paragraph (i) below.

FAR 52.229-6(d) (emphasis added)

7.  On August 13, 2010, the Contracting Officer (CO) sent a letter to Afghanistan's Ministry of Interior (MOI) on behalf of the Department of Defense (R4, tabs 33 at 258-59, 38 at 258-59, 44 at 258-59, 50 at 258-59, 54 at 258-59).  In the letter, the CO informed the MOI that "Triple Canopy's manning requirement in support of US Military contracts will exceed 500 personnel" (R4, tabs 33 at 259,  38 at 259,  44 at 259,  50 at 259,  54 at 259).  In the August 13, 2010 letter, the CO stated:

> In order to ensure there is no disruption to Afghanistan's reconstruction process, the CJSOTF-A . . . respectfully requests an exemption excepting from the 500 allowable security staff, for the above referenced contracts.  It is understood and expected that Triple Canopy will still be required to abide by all other relevant laws and regulations as a licensed Private Security Company.

(R4, tabs 33 at 259, 38 at 259,  44 at 259,  50 at 259,  54 at 259)

8.  The CO further stated that: "This exemption shall be considered immediately valid by both . . . CJSOTF-A and Triple Canopy" (R4, tabs 33 at 259, 38 at 259, 44 at 259,  50 at 259,  54 at 259).

9. On August 17, 2010, the President of Afghanistan, Hamid Karzai, issued Presidential Decree 62 on the dissolution of PSCs by December 2010 ("PD62") (R4, tabs 33 at 386, 38 at 386, 44 at 386, 50 at 386, 54 at 386). Specifically, PD62 contemplated the seizure of vehicles and weapons belonging to noncompliant PSCs to "fight corruption, to increase security for all citizens, to avoid public disorder and misuse of weapons, uniforms, and military equipment by private security companies, and to reduce tragic incidents in Afghanistan" (R4, tabs 33 at 392, 38 at 392, 44 at 392, 50 at 392, 54 at 392; *see also* R4, tabs 33 at 386, 38 at 386, 44 at 386, 50 at 386, 54 at 386).

10. On March 15, 2011, the GIRA issued Presidential Directive No. 7339 (PD7339) (R4, tabs 33 at 396-98, 38 at 396-98, 44 at 396-98, 50 at 396-98, 54 at 396-98). PD7339 required that all PSCs operating in Afghanistan pay a fee of 100,000 Afghan Afghani (AFN) for each person over the 500-employee cap and 250,000 AFN for each foreign national working without an Afghan visa (R4, tabs 33 at 397, 38 at 397, 44 at 397, 50 at 397, 54 at 397).

11. On March 24, 2011, the GIRA implemented PD7339 by assessing "penalties" for each individual that Triple Canopy employed over the 500-person limit (R4, tab 33 at 400). Specifically, the GIRA assessed a fee for 174 unregistered Afghan citizens and 30 unregistered foreign citizens (*id.*). The penalties were assessed against Triple Canopy's total number of personnel across all of its contracts (*id.*). The assessment totaled 37,860,000 AFN (*id.*).

12. The GIRA directed Triple Canopy to pay this assessment within 15 days (R4, tab 33 at 400). The GIRA notified Triple Canopy, however, that if it objected to the assessment, it could provide its "reasoning in writing" within two weeks (*id.*).

13. On March 27 and 28, 2011, representatives of the Department of Defense again issued memoranda to the GIRA requesting that Triple Canopy be exempted from the 500-person limit "to ensure there is no disruption to Afghanistan's reconstruction process" (R4 tabs 33 at 402-03, 405-07, 38 at 402-03, 405-07, 44 at 402-03, 405-07, 50 at 402-03, 405-07; 54 at 402-03, 405-07).

14. The memoranda further stated: "This exemption shall be considered immediately valid by both the United States Department of Defense Regional Contracting Centers and Triple Canopy" (R4, tabs 33 at 403, 407, 38 at 403, 407, 44 at 403, 407, 50 at 403, 407, 54 at 403, 407).

15. On April 8, 2011, Triple Canopy appealed the assessment to the GIRA (R4, tabs 33 at 409-19, 38 at 409-19, 44 at 409-19, 50 at 409-19, 54 at 409-19).

16. In its appeals, Triple Canopy indicated it had first sought an exemption from the 500-person limit in August 2010 and that it was awaiting approval from the

MOI's High Coordination Board and Council of Ministers so that it could maintain up to 1,000 employees in Afghanistan (R4, tab 33 at 409, 412).

17. On April 21, 2011, Triple Canopy informed the CO that it would submit a request for equitable adjustment (REA) if its appeals were denied (R4, tab 38 at 12).

18. On July 6, 2011, the GIRA sent a revised letter to Triple Canopy reducing the original fees assessed in the GIRA's March 24, 2011 letter (R4, tabs 33 at 421-22, 38 at 421-22, 44 at 421-22, 50 at 421-22, and 54 at 421-22).

19. The revised letter restructured the GIRA's March 24, 2011 assessment by applying a fee of 100,000 AFN per individual for 174 Afghan nationals and four foreign nationals, and 250,000 AFN per individual for three additional foreign nationals (R4, tabs 33 at 421-22, 38 at 421-22, 44 at 421-22, 50 at 421-22, 54 at 421-22). The total fee assessed against Triple Canopy was 18,550,000 AFN ($398,924.73) (R4, tabs 33 at 427, 38 at 427, tab 44 at 427, tab 50 at 427, tab 54 at 427).

20. On July 18 and 20, 2011, Triple Canopy paid the GIRA a total of 18,550,000 AFN ($398,924.73) in satisfaction of the assessed fees (R4, tab 54 at 424-25).

**I. Procedural History**

21. On June 6, 2017, Triple Canopy submitted a claim to the CO for reimbursement under each contract (R4, tabs 26, 33, 38, 44, 50, 54). To date, the government has not issued any contracting officer final decisions (COFDs). Triple Canopy appealed to the Board on November 20, 2017, on the basis of deemed denials. On May 7, 2020, the Board issued a decision denying Triple Canopy's appeals because its claims were time-barred. *Triple Canopy, Inc.*, ASBCA Nos. 61415, 61416, 61417, 61418, 61419, 61420, 20-1 BCA ¶ 37,675 at 182,893. On September 29, 2021, the Federal Circuit reversed and remanded the Board's May 7, 2020 decision. *Triple Canopy, Inc. v. Sec'y of Air Force*, 14 F.4th 1332, 1334 (Fed. Cir. 2021).

DECISION

I. Standard of Review

Board Rule 11 permits parties "to waive a hearing and to submit [their] case upon the record." The standards of review and burdens of proof of a motion for summary judgment and a decision on the merits under Board Rule 11 vary substantially. *See DG21, LLC*, ASBCA No. 57980, 15 BCA ¶ 36,016 at 175,909 n.1. Unlike a motion for summary judgment, which must be adjudicated on the basis of a

5

set of undisputed facts, pursuant to Board Rule 11, the Board "may make findings of fact on disputed facts." *U.S. Coating Specialties & Supplies, LLC*, ASBCA No. 58245, 20-1 BCA ¶ 37,702 at 183,031 (quoting *Grumman Aerospace Corp.*, ASBCA No. 35185, 92-3 BCA ¶ 25,059 at 124,886 n.13).

## II. Whether the Foreign Tax Clause Imposes a Tax

Triple Canopy contends that it is entitled to be reimbursed for the assessment it paid to the GIRA for exceeding the 500-person cap specified in PD73398 (app. br. at 14-16). Specifically, Triple Canopy argues that the fees that it paid to the GIRA are "after-imposed taxes" under FAR 52.229-6(b), and that the government breached the six contracts at issue in these appeals by failing to repay Triple Canopy for the 18,550,000 AFN ($398,924.73) that it paid to the GIRA in satisfaction of the assessed fees (*id*.; finding 19).

In contrast, the government argues that appellant is not entitled to relief under FAR 52.229-6 because appellant has not provided any evidence to prove its theory that the assessment is a tax (gov't br. at 11; gov't reply at 5). In the absence of such proof, the government argues that the assessment is "above and beyond the normal taxes and duties required for doing business" in Afghanistan because the assessment is a penalty that was expressly intended to deter PSCs with over 500 employees from forming new contracts by threatening them with fees and the seizure of property (gov't reply at 7; *see* finding 9; *see also* gov't br. at 9, 12). Alternatively, the government argues that, even if the assessment were a tax, appellant is similarly ineligible for reimbursement because appellant failed to provide the CO with a written warranty stating that no amount of the assessment was included in the contract price, as required by FAR 52.229-6(c) and (d) (gov't br. at 12-13; gov't reply at 5-6). In addition, the government argues that: (1) the assessment imposed by the GIRA is not a compensable change under FAR 52.212-4 because changes can only be made by written agreement by the parties; (2) appellant made a business decision to engage in contracts that would put it in violation of Afghani law; (3) appellant cannot credibly claim that it relied to its detriment on the government's attempts to secure an exemption for appellant to work legally in Afghanistan; and (4) appellant has not shown that the government breached its implied duty of good faith and fair dealing (gov't br. at 13-17; gov't reply at 8-11).

## A. The Legal Basis for Triple Canopy's Claim

Contract interpretation begins with the plain language of the contract's provisions. *LAI Servs., Inc. v. Gates*, 573 F.3d 1306, 1314 (Fed. Cir. 2009). In reviewing contractual language, the Board should read the contract "as a whole and [interpret it] to harmonize and give reasonable meaning to all its parts," leaving

6

no words "useless, inexplicable, inoperative, insignificant, void, meaningless or superfluous." *Walsh Grp. Ventures*, ASBCA No. 61222, 20-1 BCA ¶ 37,615 at 182,584 (citations omitted); *see also Hercules, Inc. v. United States*, 292 F.3d 1378, 1381 (Fed. Cir. 2002) (a "contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract").

Contract language is clear and unambiguous when there is only one reasonable interpretation consistent with the plain meaning. *LAI Servs.*, 573 F.3d at 1314. If a contract provision is ambiguous because it is susceptible to more than one reasonable interpretation, the Board may consider extrinsic evidence to determine the parties' intent at the time of contract formation. *TEG-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006).

Our analysis of the legal basis for Triple Canopy's claim begins with FAR 52.229-6, which is incorporated into each of Triple Canopy's contracts with the government (finding 5). Paragraph (d)(1) of FAR 52.229-6 provides:

> [T]he contract price shall be increased by the amount of any after-imposed tax or of any tax or duty specifically excluded from the contract price by a provision of this contract that the Contractor is required to pay or bear, including any interest or penalty, if the Contractor states in writing that the contract price does not include any contingency for such tax and if liability for such tax, interest, or penalty was not incurred through the Contractor's fault, negligence, or failure to follow instructions of the Contracting Officer or to comply with the provisions of paragraph (i) of this clause.[2]

FAR 52.229-6(d)(1).

Paragraph (b) of FAR 52.229-6 defines "tax" to "include fees and charges for doing business that are levied by the government of the country concerned or by its political subdivisions." FAR 52.229-6(b). The clause also defines "after-imposed tax" as:

---

[2] Paragraph (i) of the clause requires the contractor to "take all reasonable action to obtain exemption from . . . any taxes or duties, including interest or penalty, from which the United States Government, the Contractor, any subcontractor, or the transactions or property covered by this contract are exempt under the laws of the country concerned . . . ." FAR 52.229-6(i).

any new or increased tax or duty, or tax that was exempted or excluded on the contract date but whose exemption was later revoked or reduced during the contract period, other than excepted tax, on the transactions or property covered by this contract that the Contractor is required to pay or bear as the result of legislative, judicial, or administrative action taking effect after the contract date.

*Id*.

We hold that the assessment at issue in these appeals is a tax under FAR 52.229-6. FAR 52.229-6(b) defines the term "tax" broadly to include "fees and charges for doing business that are levied by the government of the country concerned." FAR 52.229-6(b). The assessment at issue here fits squarely within the term "tax" because it was a fee levied by the Afghan government for Triple Canopy to do business within Afghanistan. Therefore, it is a "tax" as defined by FAR 52.229-6(b).

The government argues that the assessment is a penalty, rather than a tax, because it is intended to deter certain conduct and its exaction is contingent upon the occurrence of that conduct (gov't br. at 10). Specifically, the government argues that it is a penalty because "the exaction is not for doing business as a private security organization, but for exceeding the manpower cap while doing so" (*id.* at 12). The government cites several cases in support of this argument. *Id.* at 10-11 (citing *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 564-74 (2012); *Dep't of Revenue v. Kurth Ranch*, 511 U.S. 767, 780-84 (1994); *Bailey v. Drexel Furniture Co. (U.S. Reps. Title: Child Lab. Tax Case)*, 259 U.S. 20, 36-37 (1922); *United States v. Reorganized CF&I Fabricators of Utah, Inc.*, 518 U.S. 213, 224 (1996); *United States v. Constantine*, 296 U.S. 287, 295 (1935)).

As an initial matter, it is well-established that taxes have always been instruments of policy meant to influence behavior in their application. *See, e.g., Sebelius*, 567 U.S. at 567 ("[T]axes that seek to influence conduct are nothing new. Some of our earliest federal taxes sought to deter the purchase of imported manufactured goods in order to foster the growth of domestic industry"); *United States v. Int'l Bus. Machines Corp.*, 517 U.S. 843, 874 (1996) (Kennedy, A., dissenting) ("As the Convention records indicate, depriving the Federal Government of the power to tax . . . was a contentious issue, given the concern that it would . . . disable Congress from using . . . taxes as an instrument of policy); *Clinton v. City of New York*, 524 U.S. 417, 451 (1998) (Kennedy, A., concurring) ("[I]f a citizen who is taxed has the measure of the tax . . . determined by the Executive alone, without adequate control by the citizen's Representatives in Congress, liberty is threatened. Money is the instrument of policy and policy affects the lives of citizens.").

8

Taxes attempt to influence behavior in a variety of ways. Some taxes punish unlawful conduct, others have a revenue-raising purpose, and still others have a "mixed-motive" of deterring certain activities while raising money. *Kurth Ranch*, 511 U.S. at 781-82. The government's cited caselaw[3] focuses primarily on punishing unlawful conduct. In *Kurth Ranch*, the Supreme Court considered a state tax that was conditioned on the commission and arrest of the crime of possessing and storing dangerous drugs. *Id.* at 781-82. In that case, the Supreme Court determined that the tax in question "departs so far from normal revenue laws as to become a form of punishment." *Id.* at 783. Similarly, in the *Child Labor Tax Case*, the Supreme Court considered a state tax limiting the working hours of children. *Child Lab. Tax Case*, 259 U.S. 20 at 36-37. Although the employment of children was not illegal at the time, the Supreme Court noted:

> [T]here comes a time in the extension of the penalizing features of the so-called tax when it loses its character as such and becomes a mere penalty, with the characteristics of regulation and punishment. Such is the case in the law before us. Although Congress does not invalidate the contract of employment or expressly declare that the employment within the mentioned ages is illegal, it does exhibit its intent practically to achieve the latter result . . .

*Id.* at 38. In *Reorganized CF&I Fabricators*, the Court used even simpler terms to describe a tax on deficiencies in certain pension plans: "if the concept of penalty means anything, it means punishment for an unlawful act or omission, and a punishment for an unlawful omission is what this exaction is." *Reorganized CF&I Fabricators*, 518 U.S. at 214. Finally, in *Constantine*, the Supreme Court concluded that a tax conditioned upon the violation of certain state liquor laws had a "penal and probatory intent rather than the gathering of revenue." *Constantine*, 296 U.S. at 295.

Unlike the unlawful conduct discussed in these cases, exceeding the manpower cap in the instant appeals is not unlawful *per se*—just more expensive. In this way, it is most similar to the tax discussed in the *Sebelius* case cited by the government. In *Sebelius*, the Supreme Court determined that the Affordable Care Act's mandate requiring most Americans to maintain minimum health insurance coverage was a tax and not a penalty. *Sebelius*, 567 U.S. at 566. Specifically, the Court noted:

---

[3] One of the most relevant cases cited by the government is *Arkel Int'l, Inc.*, but unlike the facts at issue here, the dues at issue in that case existed and were known before contract award and the Army informed Arkel that those dues would be the responsibility of the contractor. *Arkel Int'l, Inc.*, ASBCA No. 37469, 89- 3 BCA ¶ 21,965 at 110,493. Given this, we are unpersuaded by the government's reliance upon this decision.

> "While the individual mandate clearly aims to induce the
> purchase of health insurance, it need not be read to declare
> that failing to do so is unlawful. Neither the Act nor any
> other law attaches negative legal consequences to not
> buying health insurance, beyond requiring a payment to the
> IRS . . . . [I]f someone chooses to pay rather than obtain
> health insurance, they have fully complied with the law."

*Id.* at 567-68. Like the facts in *Sebelius*, the PSC Regulation, Presidential Decree 62, and Presidential Directive No. 7339 all clearly aim to limit the number of individuals employed by PSCs working in Afghanistan, but none of them render the employment of more than 500 employees unlawful. No law, decree, regulation, or directive cited by the parties attaches negative legal consequences for a PSC with more than 500 employees beyond the payment of an assessment to the GIRA. In this way, as in *Sebelius*, if a PSC chooses to pay the assessment rather than comply with the manpower cap, the PSC has fully complied with the law. Given this, we find that the government's cited caselaw supports the conclusion that the assessment at issue is a tax under FAR 52.229-6(b).

In addition, the government relies upon Article I of Presidential Directive 62 to support its position that the assessment at issue is a penalty. Article I of Presidential Directive 62 contemplates the dissolution of noncompliant PSCs to "fight corruption, to increase security for all citizens, to avoid public disorder and misuse of weapons, uniforms, and military equipment by private security companies, and to reduce tragic incidents in Afghanistan" (finding 8). The government's reliance on Presidential Directive 62 is plausible, but ultimately unavailing. Although the GIRA makes bold threats to dissolve noncompliant PSCs operating in Afghanistan in Presidential Directive 62, the execution of the Directive on Triple Canopy was relatively mild. Specifically, the GIRA originally sought to assess a fee of 37,860,000 AFN for appellant's noncompliance with the Directive, but the GIRA also immediately informed appellant of its right to appeal the assessment (findings 10-11). Once appellant did appeal the assessment, the GIRA cut the assessment in half, only requiring appellant to pay a fee of 18,550,000 AFN ($398,924.73), which appellant paid without difficulty (findings 18-19). We can imagine a scenario in which a tax was so onerous that it became a penalty to noncompliant PSCs, possibly even threatening the continued viability of their businesses. *See, e.g.*, *Child Lab. Tax Case*, 259 U.S. 20 at 36 ("If an employer departs from this described course of business, he is to pay to the government one-tenth of his entire net income in the business for a full year."). But that is not what happened here. The GIRA required Triple Canopy to pay a fee for doing business within Afghanistan, and we cannot see how such a fee is anything other than a tax. And so, we find the government's penalty argument unavailing.

We are equally unpersuaded by the government's alternative argument that appellant is not entitled to relief because appellant failed to provide the CO with a written warranty (gov't br. at 12-13; gov't reply at 5-6). The government relies heavily on the Board's decision in *H.Z. & Co., Ltd.*, ASBCA No. 29590, 85-2 BCA ¶ 18,062, to argue that under FAR 52.229-6(c) and (d), appellant was required to submit a written warranty to the CO stating that no amount of the assessment at issue here was included in the contract price (gov't br. at 12-13; gov't reply at 5-6). The Board's ruling in *HZ* was based on two holdings. First, the Board held that the contractor failed to follow the CO's instructions regarding the use of vendors who could supply products exempt of duty taxes. Second, the Board held that the contractor failed to include a written warranty that its contract price did not include the duty taxes it seeks to recover. *Id.* at 90,659.

In these appeals, there is no indication that the CO ever instructed Triple Canopy to not pay the taxes or that Triple Canopy disregarded any direction from the CO regarding the taxes. To the contrary, the government did everything it could to seek an exemption from the taxes on behalf of Triple Canopy (findings 7-8, 13-14). It was only after the government's efforts failed that Triple Canopy went ahead and paid the taxes.

Moreover, in these appeals there is no expectation that a written warranty would be necessary, given the government's efforts to seek an exemption on Triple Canopy's behalf. As Triple Canopy stated in its claim, the fees did not exist at all until March 2011, and were not assessed against Triple Canopy until its appeals were denied in June 2011 (findings 15-20). Although the MOI limited the number of PSC personnel in 2008, there were no fees associated with the limit until March 2011 (finding 10). Moreover, even if the initial law establishing the personnel limit were accompanied by fees at the time the contracts were issued, the Government and Triple Canopy were operating under the assumption that TC was exempt from that law.

On the facts presented here, we hold that, although Triple Canopy did not expressly state in its claim that the taxes were not included in the contract price, such a statement was unnecessary given the circumstances.

Finally, we do not need to address the government's other alternative arguments. Specifically, the government argues that: (1) the assessment imposed by the GIRA is not a compensable change under FAR 52.212-4 because changes can only be made by written agreement by the parties; (2) appellant made a business decision to engage in contracts that would put it in violation of Afghani law; (3) appellant cannot credibly claim that it relied to its detriment on the government's attempts to secure an exemption for appellant to work legally in Afghanistan; and (4) appellant has not shown that the government breached its implied duty of good faith and fair dealing (gov't br. at 13-17; gov't reply at 8-11). These arguments address Triple Canopy's

arguments in the alternative, but because we have decided that the assessment at issue here is a recoverable tax, we need not entertain these arguments in any detail here.

## CONCLUSION

We find that the assessment at issue here is a tax under FAR 52.229-6. Given this, we conclude that the government was required to compensate Triple Canopy for the taxes imposed by the GIRA. Accordingly, the appeals are sustained. We remand to the parties for the determination of quantum.

Dated: March 23, 2023

KENNETH D. WOODROW
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 61415, 61416, 61417, 61418, 61419, 61420, Appeals of Triple Canopy, Inc., rendered in conformance with the Board's Charter.

Dated:  March 23, 2023

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals